**GUARANTY FINANCIAL SERVICES, INC., and Guaranty Federal Savings Bank, Plaintiffs–Appellees,**

v.

**T. Timothy RYAN, Director, Office of Thrift Supervision, in his official capacity and as successor in interest to the Federal Home Loan Bank Board, and Federal Deposit Insurance Corporation in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation, Defendants–Appellants.**

No. 90–8773.

United States Court of Appeals, Eleventh Circuit.

March 25, 1991.

Frank L. Butler, III, Asst. U.S. Atty., Macon, Ga., Jacob Lewis, Washington, D.C., for Dept. of Justice.

Aaron B. Kahn, Office of Thrift Supervision, Washington, D.C., for F.D.I.C.

F. Lane Heard, III, Williams & Connolly, Washington, D.C., Tracy Greer, Roy N. Cowart, Cowart & Varner, Warner–Robins, Ga., for plaintiffs-appellees.

Edward M. Selfe, Birmingham, Ala., William L. Gardner, Morgan, Lewis & Bockius, Washington, D.C., for amicus curiae, Secor Bank.

Before COX and BIRCH, Circuit Judges, and GIBSON *, Senior Circuit Judge.

COX, Circuit Judge:

This case is an appeal by the Office of Thrift Supervision (OTS) and the Federal Deposit Insurance Corporation (FDIC) of a preliminary injunction that, among other things, prevents the agencies from excluding an intangible asset called supervisory goodwill from the regulatory capital computation for Guaranty Federal Savings Bank. Because we hold that the district court mistakenly concluded that the plaintiffs had a substantial likelihood of success on the merits, we reverse.

## I. BACKGROUND

Houston Federal Savings and Loan Association (Houston Federal) was a mutual

---

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

savings and loan association based in Warner Robins, Georgia. It received a federal charter in 1981. In 1985, a new officer at Houston Federal discovered a series of questionable consumer loans that were expected to generate substantial losses. In 1986 Houston Federal reported a negative net worth.

In 1987 Houston Federal and Guaranty Financial Services, Inc. (Guaranty Financial) submitted an application to the Federal Home Loan Bank Board (the Bank Board) for approval of what is called a supervisory conversion. The application proposed that Houston Federal be converted to a stock association and merged into Guaranty Federal Savings Bank (Guaranty Federal), a federal stock savings bank, and that Guaranty Federal simultaneously be acquired by Guaranty Financial. Guaranty Financial was a holding company that would hold all the stock of Guaranty Federal and contribute $1 million in capital by purchasing Guaranty Federal common stock. Houston Federal's directors would own one-third of the stock of Guaranty Financial.

In December 1987, the Federal Savings and Loan Insurance Corporation (FSLIC) and the Bank Board approved the application subject to certain conditions. In January 1988, Guaranty Financial and the FSLIC entered into a written agreement entitled "Regulatory Capital Maintenance/Dividend Agreement" (the Capital Maintenance Agreement). This Agreement referred to and had attached to it a letter in which the FSLIC and the Bank Board agreed to grant Guaranty five forbearances, one of which related to accounting requirements concerning what is called "supervisory goodwill." The letter stated that "[f]or purposes of reporting to the Board, the value of any intangible asset resulting from the application of push-down accounting in accounting for the purchase, may be amortized by Guaranty Federal over a period not to exceed (25) years by the straight line method." The parties agree that this provision allowed amortization of supervisory goodwill over a twenty-five year period.

In mergers and acquisitions using the purchase method of accounting, when the purchase is being recorded using push-down accounting (a method by which the acquisition of a subsidiary is shown on the books of the subsidiary), the book value of the acquired thrift's assets and liabilities are adjusted to fair market value at the time of the acquisition. To the extent that fair market value of the acquired liabilities is more than the fair market value of the acquired assets, that difference is recorded as goodwill—an intangible asset that may be amortized over a period of years. The goodwill created in connection with mergers and acquisitions supervised by the FSLIC and the Bank Board is known as supervisory goodwill.

Following the supervisory conversion, Guaranty Federal had a negative *tangible* net worth. This was anticipated by the FSLIC and the Bank Board. Only by treating supervisory goodwill as capital for regulatory purposes could Guaranty Federal have been deemed a solvent institution. Treating this supervisory goodwill as capital, its net worth immediately after the conversion was more than $1 million.

In August 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (1989) (codified in scattered sections of 12 U.S.C.A.), making significant changes in the regulation of federally chartered and insured savings and loan institutions. Among other things, FIRREA abolished the FSLIC, transferring its functions to other agencies, and abolished the Bank Board, replacing it with the Office of Thrift Supervision (OTS), an office within the Department of the Treasury.

Section 301, § 5(t)(3)(A) of FIRREA set in motion the events that led to this lawsuit. It provides that the use of supervisory goodwill in calculating core capital must be completely phased out by January 1, 1995. 12 U.S.C.A. § 1464(t)(3)(A) (Supp. 1990). Moreover, during that phase-out period goodwill must be amortized over no more than twenty years; in other words, the thrift must remove at least one-twenti-

eth of its supervisory goodwill from its capital base and charge it against its profits each year. *Id.* § 1464(t)(9)(B). The OTS, as the agency charged with enforcing the statute, interpreted these requirements as applying to all thrifts not specifically exempted by FIRREA. The OTS thus determined to enforce the new requirements even against institutions, such as Guaranty Federal, that had obtained capital and accounting forbearances pursuant to supervisory conversion agreements, since FIRREA makes no explicit exception for thrifts with such agreements. Thrift Bulletin 38-2 (Jan. 9, 1990), *see* R.1-6 (exhibit F).

Unable to include goodwill as capital for purposes of reporting to the OTS, Guaranty Federal was not able to meet its minimum capital requirements. As of December 1989, Guaranty Federal had approximately $2.7 million in unamortized supervisory goodwill on its books. The bank submitted a capital enhancement plan in January 1990, and a revised plan in February. Pending review of the plan, the OTS prohibited Guaranty Federal from growing beyond net interest credited, making capital distributions, or acting inconsistently with any other operational restrictions dictated by the OTS. *See* 12 C.F.R. § 567.10(a)(3) (1990). Without approving or disapproving the plan, the OTS advised the Guaranty Federal Board of Directors in March 1990 that "Guaranty Federal is deemed to be insolvent" and directed that "Guaranty Federal may not increase its liabilities or make any new loans or investments without the prior written approval of the District Director." In June 1990 the OTS informed Guaranty Federal that it was preparing to send a "consent to merge" letter calling upon the bank to authorize the OTS to sell or merge the bank. This lawsuit followed.

## II. PROCEEDINGS IN THE DISTRICT COURT

Guaranty Federal and Guaranty Financial (hereafter referred to collectively as "Guaranty" except where indicated otherwise) responded to the position taken by the OTS by filing in the district court in July 1990 an action for a declaratory judgment and injunctive relief. The complaint alleged, among other things, that the refusal of the defendant agencies to honor the agreement made by their predecessor agencies to allow Guaranty to treat supervisory goodwill as capital constituted a breach of contract and a taking of property without due process and just compensation, was barred by principles of estoppel, and in any event violated FIRREA.[1]

Following a hearing on Guaranty's application for a preliminary injunction, the district court concluded that there was a substantial likelihood that Guaranty would prevail on the merits on its contract and estoppel claims. The court found that the forbearance agreement was an integral part of the conversion agreement and that the $1 million investment made by the plaintiffs would not have been made in the absence of the forbearance agreement. The court assumed that the forbearance agreement was a contract that created rights, duties and obligations protected by the savings provision found in Section 401(g) of FIRREA. Finding that the other requisites for injunctive relief had also been met, the district court entered a preliminary injunction prohibiting the OTS and the FDIC "from requiring that plaintiffs execute a consent to merge agreement and from excluding the amortization of supervisory goodwill from any and all determinations of the plaintiff institution's capitalization as set out in the forbearance agreement." *Guaranty Fin. Servs. v. Director, Office of Thrift Supervision,* 742 F.Supp. 1159, 1163 (M.D.Ga.1990).

## III. PRELIMINARY INJUNCTION

In order to grant a preliminary injunction, a district court must find the following:

(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substan-

---

**1.** On appeal, Guaranty does not argue that its likelihood of success on the estoppel claim supports the preliminary injunction.

tial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to the defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*United States v. Lambert,* 695 F.2d 536, 539 (11th Cir.1983) (quoting *Canal Auth. v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974)).

■ We review the district court's decision to grant the preliminary injunction for abuse of discretion, but if the court misapplied the law in making its decision we do not defer to its legal analysis. *Tally–Ho, Inc. v. Coast Community College Dist.,* 889 F.2d 1018, 1020 (11th Cir.1989); *E. Remy Martin & Co. v. Shaw–Ross Int'l Imports,* 756 F.2d 1525, 1529 (11th Cir. 1985). *See also United States v. Jefferson County,* 720 F.2d 1511, 1520 n. 21 (11th Cir.1983) ("where a preliminary injunction has been granted based on an error of law even as to one of the four prerequisites, the injunction must fall because the movant has not met his burden of persuasion on all four counts") (emphasis omitted).

## IV. DISCUSSION

Guaranty successfully argued to the district court that it had made a contract with the Bank Board and the FSLIC that gave it the right to treat supervisory goodwill as regulatory capital for twenty-five years, and because Section 401(g) of FIRREA provides that the abolition of the Bank Board and the FSLIC "shall not affect the validity of any right, duty or obligation of the United States, the Federal Home Loan Bank Board, or any other person," 12 U.S.C.A. § 1437 note (Supp.1990), the OTS has breached the contract by applying its new regulations to Guaranty. Guaranty contends that it contracted with the agencies to contribute $1,000,000 and save a failing thrift, thus relieving the government and the taxpayers of the necessity of liquidating it and further depleting an already insolvent insurance fund. In return, the agencies committed themselves to allow Guaranty to treat the supervisory goodwill created by the conversion as regulatory capital for twenty-five years so that Guaranty would have sufficient time to revive the ailing thrift and make a profit.

This contract, according to Guaranty, was embodied in five separate documents, which it calls the "conversion agreement": the letter from the agencies approving the conversion, the forbearance letter, the tax certification letter (attesting that Houston Federal was legitimately insolvent), the subscription agreement (providing that Guaranty Federal would buy all the stock of the new institution for $1,000,000), and the Capital Maintenance Agreement (providing among other things that the investors would maintain the new institution's capital at levels required by regulations).

The agencies, on the other hand, argue that the forbearance letter represents a voluntary, revocable decision by the government not to exercise regulatory authority. They contend that the letter confers on Guaranty no binding right to any specific treatment of supervisory goodwill. The agencies point out that several provisions in the Capital Maintenance Agreement specifically warn Guaranty that the regulations underlying the agreement may be changed, resulting in a change in Guaranty's obligations.

While the parties in this case expend considerable energy arguing whether the conversion agreement documents constitute a contract, we need not struggle with the issue. Article VI(B) of the Capital Maintenance Agreement provides, "This Agreement shall be deemed a contract made under and governed by Federal law." We assume without deciding that the agencies did indeed make a contract with Guaranty.

### A. *Contract Interpretation*

■ Assuming, however, that a contract was made, we must still determine what the contract means. We must decide if Guaranty's contract with the agencies prevents the agencies from enforcing FIRREA's new capital standards against Guaranty.

In interpreting the contract we steer by two stars: (1) general principles of contractual interpretation, and (2) a special rule of construction applicable when a contract purports to bind the sovereign. Both courses lead us to the same destination: Guaranty's contract with the agencies allows the agencies to change the regulations, even if those changes adversely affect Guaranty.

Several parts of the Agreement that Guaranty signed warn that the regulatory scheme may be changed to Guaranty's detriment. Article I(D) of the Agreement provides, " 'Regulatory Capital' means regulatory capital defined in accordance with 12 C.F.R. § 561.13 *or any successor regulation thereto* " (emphasis added). Article I(E) provides that " 'Regulatory Capital Requirement' means the Institution's Regulatory capital requirement at a given time computed in accordance with 12 C.F.R. § 563.13(b), *or any successor regulation thereto* \* " (emphasis added). The asterisk directs the reader to a note at the bottom of the page that reads, "See Exhibit A, FHLBB forbearance letter, dated December 29, 1987." Finally, Article VI(D) provides that "All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being *expressly understood* that subsequent amendments to such regulations may be made and that *such amendments may increase or decrease the Acquiror's obligation under this Agreement* " (emphasis added).

Most of Guaranty's argument is bottomed on a provision in the forbearance letter incorporated into the agreement by the asterisk in Article I(E). The letter begins, "In connection with the approval to convert from a federally chartered mutual savings and loan association to a federally chartered stock savings bank ... the following forbearances are hereby granted." The third forbearance concerns the treatment of supervisory goodwill: "For purposes of reporting to the Board, the value of any intangible asset resulting from the application of push-down accounting in accounting for the purchase may be amortized by Guaranty Federal for a period not to exceed (25) years by the straight-line method."

Guaranty argues that this provision confers upon it an irrevocable right to treat supervisory goodwill as regulatory capital for twenty-five years. Absent an explicit congressional abrogation of this contractual right, it contends, the agencies may not withdraw from Guaranty its bargained-for accounting privilege.

Guaranty's interpretation of the forbearance provision is in direct conflict with the contract provisions that expressly provide that regulations may be changed. Article VI(D) unmistakably warns Guaranty that its obligations under the contract may be increased by subsequent regulation.

Under general principles of contractual interpretation, "a contract should be construed so as to give effect to all the contract's provisions. Similarly, if two clauses of a contract appear to be in conflict, the preferred interpretation is the one that gives a 'harmonious interpretation' to the clauses." *Johnson Controls, Inc. v. City of Cedar Rapids*, 713 F.2d 370, 374 (8th Cir.1983) (citation and footnote omitted; cases cited).

We interpret the forbearance provision to mean that the agencies would allow Guaranty to treat supervisory goodwill as regulatory capital so long as the regulatory remained as it was when the contract was signed. The agencies, in other words, granted Guaranty an exception to the rules of the game, and promised that the exception would be valid so long as the rules stayed the same. But the agencies, at the same time they made that promise, also unambiguously warned Guaranty that the rules might later change to Guaranty's detriment. By signing the contract, Guaranty took that chance, in effect wagering the chance that the rules would be changed against the potential return if they were not. This interpretation, unlike Guaranty's, harmonizes the various provisions of the contract instead of placing them in conflict, and is therefore preferable to Guaranty's reading. "[A]n interpretation that gives a reasonable meaning to all

parts of the contract will be preferred to one that leaves portions meaningless; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible." *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983); *see also Heryford v. Davis*, 102 U.S. 235, 245, 26 L.Ed. 160 (1880) ("This part of the contract is to be construed with the other provisions so that if possible, or so far as is possible, they may all harmonize").

Furthermore, our construction of this contract is supported by the Supreme Court's decision in *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986). In that case the state of California and employees of its agencies sued to block implementation of an amendment to the Social Security Act that revoked a state's prior right to withdraw its participation in the social security system once it had voluntarily joined. The state contended that the agreement by which it joined conferred upon it the right to withdraw under certain conditions, and that right constituted a property right that could not be revoked by the United States without the payment of just compensation. *Id.* at 49, 106 S.Ct. at 2395.

The Supreme Court disagreed, holding that the district court's opinion blocking implementation of the amendment "heeded none of [the] Court's often-repeated admonitions that contracts should be construed, if possible, to avoid foreclosing exercise of sovereign authority." *Id.* at 52–53, 106 S.Ct. at 2397. The Court found it significant that Section 1104 of the Social Security Act reserves to Congress the "right to alter, amend or repeal any provision" of the Act: "The State accepted the Agreement under an Act that contained the language of reservation. That language expressly notified the State that Congress retained the power to amend the law under which the Agreement was executed and by amending that law to alter the Agreement itself." *Id.* at 54, 106 S.Ct. at 2397–98.

Like the Social Security Act in *Bowen*, the contract we interpret here contains ex-press language of reservation. Just as California had express notice that "Congress retained the power to amend the law under which the Agreement was executed and by amending that law to alter the Agreement itself," *Bowen*, 477 U.S. at 54, 106 S.Ct. at 2397–98, Article VI(D) of the capital maintenance agreement (as well as Articles I(D) and (E)) gave Guaranty express notice that the regulatory scheme could change and therefore alter Guaranty's obligations under the Agreement. In fact, in *Bowen* the Supreme Court thought it proper to require California to look outside the language of its agreement, to the underlying Social Security Act, for the state's warning that its obligations under the agreement might change. Guaranty's warning is even more open, unambiguously expressed in the agreement it signed.

 We are further guided in our interpretation by the context in which this contractual dispute arises. According to the Supreme Court, its admonitions against construing a contract to deprive the sovereign of authority "take on added force when the arrangement pursuant to which the Government is claimed to have surrendered a sovereign power is one that serves to implement a comprehensive social welfare program affecting millions of individuals throughout our Nation." *Bowen*, 477 U.S. at 53, 106 S.Ct. at 2397. The structure and purpose of federal regulation of the savings and loan industry is just such a program. Like many of our social welfare programs, extensive federal regulation of savings and loan institutions was born of the Great Depression, which "spurred the reformation of the thrift industry into a federally-conceived and assisted system to provide citizens with affordable housing funds." H.R.Rep. No. 54, 101st Cong., 1st Sess., pt. 1, at 292 (1989), *reprinted in* 1989 U.S.Code Cong. & Admin.News 86, 88. Contracts related to such programs should not lightly be construed to deprive the sovereign of the ability to work changes in those programs when it sees fit.

In deciding whether the contract between Guaranty and the agencies confers upon Guaranty a fixed right to treat super-

visory goodwill as regulatory capital or a revocable one, therefore, we apply "the rule of construction laid down by the Supreme Court, that one who wishes to obtain a contractual right against the sovereign that is immune from the effect of future changes in law must make sure that the contract confers such a right in unmistakable terms." *Western Fuels–Utah v. Lujan,* 895 F.2d 780, 789 (D.C.Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 47, 112 L.Ed.2d 24 (1990); *accord Great Lakes Higher Educ. Corp. v. Cavazos,* 911 F.2d 10, 16 & n. 13 (7th Cir.1990); *Education Assistance Corp. v. Cavazos,* 902 F.2d 617, 629 (8th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 246, 112 L.Ed.2d 205 (1990). Applying this rule of construction, we conclude that the contract between Guaranty and the agencies did not give Guaranty an unmistakable right to treat supervisory goodwill as regulatory capital for twenty-five years. Rather, we interpret the contract to mean that Guaranty had the right to treat its goodwill as regulatory capital and amortize it over a twenty-five year period for so long as the statutes and regulations governing the area remained as they were when the agreement was signed.

### B. *Statutory Interpretation*

■ We have concluded that the contract between Guaranty and the agencies reserved to Congress and the agencies the right to change the regulatory scheme in a way that changes Guaranty's obligations. We must now address Guaranty's argument that Congress has not abrogated Guaranty's rights under the Agreement, irrespective of their right to do so.

The OTS, acting pursuant to statutory mandate, has promulgated regulations under FIRREA. The OTS's regulation on the phase-out of supervisory goodwill is merely a copy of the schedule in Section 301, § 5(t)(3)(A) of FIRREA. 12 C.F.R. § 567.5(a) (Supp.1990). However, the OTS's interpretation of that regulation adds something not clearly spelled out on the face of the statute. The OTS interprets FIRREA to require that *all* thrifts adhere to the phase-out schedule in Section 301, § 5(t)(3)(A), even those such as Guar-

anty that have capital or accounting forbearances relating to supervisory goodwill. *See* Thrift Bulletin 38–2 (Jan. 9, 1990).

Guaranty contends that the OTS may not enforce such an interpretation because FIRREA includes a savings provision, Section 401(g), that clearly protects "any right, duty or obligation" enforceable by or against the Bank Board. 12 U.S.C.A. § 1437 note (Supp.1990). According to Guaranty, this savings provision demonstrates the congressional intent that capital or accounting forbearance agreements not be abrogated. Because Congress intended that Section 401(g) protect those contracts, Guaranty argues, the OTS cannot promulgate regulations that abrogate those contracts.

The Supreme Court has explained clearly the process by which we review administrative constructions of statutes:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted). In a footnote the Court explains that to uphold an agency interpretation a reviewing court need not conclude that the agency's interpretation was the only one possible, or even the one the court might have chosen. *Id.* at 843 n. 11, 104 S.Ct. at 2782 n. 11.

Following the Supreme Court's method, therefore, we must first determine whether "Congress has ... directly addressed the precise question at issue," *Id.* at 843, 104 S.Ct. at 2782—whether the supervisory goodwill phase-out abrogates even contractual forbearances, or whether such agreements are saved by Section 401(g). If Congress provides a clear answer, we enforce it; if it does not, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

The first step in statutory construction is to look at the words of the statute. Section 301, § 5(t)(3)(A) of FIRREA specifically addresses the treatment of supervisory goodwill. The section reads as follows:

**(3) Transition rule**

**(A) Certain qualifying supervisory goodwill included in calculating core capital**

Notwithstanding paragraph (9)(A), an eligible savings association may include qualifying supervisory goodwill in calculating core capital. The amount of qualifying supervisory goodwill that may be included may not exceed the applicable percentage of total assets set forth in the following table:

| For the following period: | The applicable percentage is: |
| --- | --- |
| Prior to January 1, 1992 | 1.500 percent |
| January 1, 1992–December 31, 1992 | 1.000 percent |
| January 1, 1993–December 31, 1993 | 0.750 percent |
| January 1, 1994–December 31, 1994 | 0.375 percent |
| Thereafter | 0 percent |

---

12 U.S.C.A. § 1464(t)(3)(A) (Supp.1990).[2]

Section 301, § 5(t)(3)(A) is unqualified. It provides for no exceptions to the phase-out schedule it establishes. However, FIRREA's next section appears to establish one exception to the seemingly absolute requirements in Section 301, § 5(t)(3)(A). Section 302 of FIRREA, 12 U.S.C.A. § 1467a note (Supp.1990), is a savings provision that preserves, notwithstanding any changes made by FIRREA, "capital recovery" plans authorized by 12 U.S.C.A. § 1467a (1989) and 12 U.S.C.A. § 1730i (1989), popularly known as the Competitive Equality Banking Act (CEBA) of 1987. FIRREA repeals the authority to create capital recovery plans under CEBA, *see* 12 U.S.C.A. § 1467a note (Supp.1990). Neither party contends that this section is directly relevant to Guaranty—the agreement between Guaranty and the agencies is not a CEBA plan—but the agencies urge this section upon us as evidence that Congress knew how to make an exception to FIRREA's capital standards when it wanted to, and it chose not to make an exception in situations such as Guaranty's.

The agencies argue in essence the old rule of statutory construction, *"expressio unius est exclusio alterius"*; in other words, the mention of one thing implies the exclusion of others. We have on occasion taken heed of this rule of construction, *see, e.g., Associates Commercial Corp. v. Sel-O-Rak Corp.*, 746 F.2d 1441, 1444 (11th Cir.1984), but we have also recently cautioned against its unquestioning application. In *United States v. Castro*, 837 F.2d 441, 442–43 (11th Cir.1988), we observed that "this principle has its limits and exceptions and cannot apply when the legislative history and context are contrary to such a reading of the statute."

This rule of construction carries little weight in this case. Neither the savings provision for CEBA plans in FIRREA nor the enabling provisions in CEBA make any mention of supervisory goodwill. Presumably, supervisory goodwill forbearances

**2.** The statute defines "qualifying supervisory goodwill" as goodwill "existing on April 12, 1989, amortized over the shorter of—

(i) 20 years, or

(ii) The remaining period for amortization in effect on April 12, 1989."

12 U.S.C.A. § 1464(t)(9)(A) (Supp.1990).

could be a part of such "capital recovery" plans, but nothing in CEBA requires that such forbearances be granted. As a result, we are skeptical of how much light Section 302 sheds on the supervisory goodwill question. Because Section 302 is not a specific congressional exception to FIRREA's supervisory goodwill provision, but rather an exception to the capital standards generally, it is a precarious base on which to rest the argument that the mention of one thing excludes others.

Indeed, Guaranty argues that the maxim is inapplicable for quite another reason: because Congress *has* specified another exception to FIRREA's treatment of supervisory goodwill. Guaranty directs our attention to Section 401(g), which reads as follows:

> "(g) **Savings provisions relating to FHLBB.—**
>
> "(1) **Existing rights, duties, and obligations not affected.**—Subsection (a) [abolishing the Bank Board and the FSLIC] shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which—
>
> "(A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owners' Loan Act of 1933, or any other provision of law applicable with respect to such Board (other than title IV of the National Housing Act), and
>
> "(B) existed on the day before the date of the enactment of this Act."

12 U.S.C.A. § 1437 note (Supp.1990). In Guaranty's view, this provision is an unambiguous savings provision, denominated as such in the statute, that clearly demonstrates Congress' intent not to abrogate contracts such as the one Guaranty claims it had with the agencies.

We find the provision less clear than does Guaranty. By Section 401(g)'s terms, it is concerned only with the effect of subsection (a), which eliminates the Bank Board and the FSLIC. If Congress meant Section 401(g) to protect the abolished agencies' contracts from the effect of every part of FIRREA, or from acts taken by the successor agencies, it expressed its intention inartfully, to say the least.

The language of Section 401(g) does not clearly convey a congressional intention to qualify the phase-out of supervisory goodwill or any of the other new capital standards. It seems to us that the injury that Guaranty complains of is not the result of subsection (a). If Congress had not included the supervisory goodwill phase-out in FIRREA, Guaranty would have suffered no injury. But if Congress had included the phase-out but not abolished the Bank Board and the FSLIC, Guaranty would be in the same predicament it is now. This suggests to us that the possible loss of Guaranty's supervisory goodwill forbearance is the result not of the abolition of the agencies, but of the new capital standards, and that a savings provision that says that the abolition of the agencies "shall not affect the validity of any right, duty, or obligation" is inapplicable to Guaranty's situation.

Nor is Guaranty's interpretation the only reasonable reading of the provision. We think it quite possible that with Section 401(g)—and its companion provisions protecting the FSLIC's contracts, as well as the regulatory acts of the Bank Board and the FSLIC—Congress merely intended to prevent a vacuum of authority that could potentially further destabilize an already shaky industry.

We conclude that the statute is ambiguous on the question whether contractual forbearances are abrogated or saved.[3]

---

3. That the various courts that have already decided this question are split supports our conclusion that the statute is ambiguous. *See, e.g., Security Sav. & Loan Ass'n v. Director, Office of Thrift Supervision,* No. J90–0486(L) (S.D.Miss. Feb. 22, 1991) (granting permanent injunction preventing OTS from abrogating supervisory goodwill forbearance); *Sterling Sav. Ass'n v.*

*Ryan,* 751 F.Supp. 871 (E.D.Wash.1990) (granting preliminary injunction prohibiting OTS from abrogating supervisory goodwill forbearance); *Winstar Corp. & United States Fed. Sav. Bank v. United States,* 21 Cl.Ct. 112 (1990) (finding implied-in-fact contract protecting right to supervisory goodwill forbearance); *Franklin Fed. Sav. Bank v. Director, Office of Thrift Su-*

Therefore, in order to determine whether Congress has "directly addressed the precise question at issue," *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782, we have undertaken an analysis of the available legislative history to help us determine whether Congress thought that FIRREA abrogated agreements such as the one Guaranty had with the agencies. Our review of the legislative history convinces us that Congress intended FIRREA to abrogate capital forbearances such as Guaranty's.

■ When considering the legislative history of enacted legislation, an authoritative source is the official congressional reports on the bill. In the report of the House Committee on Banking, Finance and Foreign Affairs (the bill that passed was the House's version, *see* 1989 U.S.Code Cong. & Admin.News 86), the committee had this to say about FIRREA's increased capital requirements:

> To a considerable extent, the size of the thrift crisis resulted from the utilization of capital gimmicks that masked the inadequate capitalization of thrifts. It is the shared belief of the Committee and the Administration that if a crisis of this nature is to be prevented from happening again, thrifts must be adequately capitalized against losses.

> The legislation seeks to provide this protection by establishing a core capital requirement of 3% of assets for savings institutions. The 3% core capital requirement takes effect on June 1, 1990. Beginning then, certain qualifying intangibles [e.g., supervisory goodwill] can be included on a declining basis until, by

January 1, 1995, the 3% must be met without any qualifying intangibles.

H.R.Rep. No. 54, 101st Cong., 1st Sess., pt. 1, at 310–11 (1989) [House Report], *reprinted in* 1989 U.S.Code Cong. & Admin. News 86, 106–07 (bracketed material inserted).

Although this passage demonstrates the importance of the toughened capital standards, including the phase-out of supervisory goodwill, it does not specifically say that the phase-out is to affect all thrifts including those with long-term supervisory goodwill agreements with the agencies. However, we can with little chance of error infer exactly that from the dissenting views that follow the committee's report. Three committee members offered the following opinion:

> Unfortunately, [Section 301, § 5(t)(3)(A)] was amended by the Full Committee to phase out the treatment of goodwill for capital purposes over a five year period. Simply put, the Committee has reneged on the agreements that the government entered into concerning supervisory goodwill.

> ... Clearly, the agreements concerning the treatment of goodwill were part of what the institutions had bargained for. Just as clearly, the Committee is abrogating those agreements.

*Id.* at 498, *reprinted in* 1989 U.S.Code Cong. & Admin.News at 293–94 (additional views of Reps. Annunzio, Kanjorski, and Flake).

Such an opinion was not idiosyncratic. It was shared by both those who were opposed to the bill's treatment of supervisory goodwill and those who supported it.

---

*pervision,* No. 2–90–166, 1990 WL 123145 (E.D. Tenn. July 16, 1990) (granting permanent injunction preventing OTS from abrogating supervisory goodwill forbearance); *see also Far W. Fed. Bank v. Director, Office of Thrift Supervision,* 746 F.Supp. 1042, 1047 (D.Or.1990) ("FIRREA [does] not abrogate the Conversion Agreement, because the Conversion Agreement is ... preserved under § 401(g)"; not involving supervisory goodwill); *Security Fed. Sav. Bank v. Director, Office of Thrift Supervision,* 747 F.Supp. 656, 658 (N.D.Fla.1990) ("FIRREA does not authorize OTS to unilaterally abrogate the contract between FHLBB and the plaintiffs"; not involving supervisory goodwill). *But see*

*Century Fed. Sav. Bank v. United States,* 745 F.Supp. 1363 (N.D.Ill.1990) (no contract on supervisory goodwill, but if there were § 401(g) would be inapplicable); *Flagship Fed. Sav. Bank v. Wall,* 748 F.Supp. 742 (S.D.Cal.1990) (no contract on supervisory goodwill, but if there were § 401(g) would be inapplicable); *El Paso Sav. Ass'n v. Director, Office of Thrift Supervision,* No. EP–89–CA–426–H (W.D.Tex. Jan. 8, 1990) ("the debate in the House ... makes it clear that the members of the body understood and intended that following passage of the Act, so-called 'supervisory goodwill' could no longer be counted by a thrift institution in meeting the newly imposed capital requirements").

*Compare id.* at 534, *reprinted in* 1989 U.S.Code Cong. & Admin.News at 327 ("For those institutions with substantial supervisory goodwill, the bill radically changes the terms of previously negotiated transactions") (additional views of Reps. Hiler, Ridge, Bartlett, Dreier, McCandless, Saiki, Baker, and Paxon) *with id.* at 544, *reprinted in* 1989 U.S.Code Cong. & Admin.News at 336 ("The new capital standards embodied in the bill reported by the Committee are intended to apply to each and every thrift equally and without exception and, when enacted into law, will replace both the previous standards themselves and any exceptions that may have been granted where appropriate.... In the case of capital forbearances, an overriding public policy would be jeopardized by the continued adherence to arrangements which were blithely entered into by the FSLIC") (supplemental views concerning forbearances from industry-wide capital standards of Reps. Schumer, Morrison, Roukema, Gonzalez, Vento, McMillen and Hoagland).

In fact, the congressional understanding that FIRREA would abrogate the capital forbearances granted Guaranty and other thrifts was clear enough that two amendments were offered to prevent or impede that result. Rep. Quillen, arguing that "a deal is a deal," 135 Cong.Rec. H2700 (daily ed. June 15, 1989), proposed "an amendment that grandfathers in all of these savings and loan institutions that had such agreements." *Id.* at H2701.

However, Rep. Quillen withdrew his amendment. Although he said it was "a good amendment," he also said it would be "unfair to the House" to debate both his amendment and that offered by Rep. Hyde. *Id.* Rep. Hyde's amendment would have provided thrifts who could have met the new capital standards but for the exclusion from core capital of supervisory goodwill the right to a hearing after notice, and judicial review of the result of that hearing, before any federal banking agency could take action against the thrift for failing to comply with the new capital standards. Rep. Hyde argued that the bill merely provided the thrifts with "due pro-

cess" before taking from them contractual benefits. *Id.* at H2704.

Rep. Quillen withdrew his amendment, which squarely presented the question whether FIRREA was meant to abrogate capital forbearances, before it came to a vote, and Rep. Hyde's amendment, which was defeated, did not directly present Congress with that issue. We are therefore unwilling to draw any inferences from the failure of either of these provisions to become law.

Although we draw no inferences from the fate of the two amendments, the comments made on the floor during the debate on Rep. Hyde's amendment, as well as at other points during the congressional debate, only serve to strengthen our conviction that Congress intended that FIRREA would abrogate any capital forbearances after the phase-out period. In a statement appended to the House Judiciary Committee's report, Rep. Hyde summarized FIRREA's treatment of supervisory goodwill as follows:

> [Thrifts] were told that they would be able to carry this goodwill on their books for substantial periods of time. The savings and loans that entered into these arrangements have documentary evidence that they were encouraged by the federal banking regulatory agencies to enter into these transactions. The courts might well construe these agreements as formal contracts.
>
> Now, some six or seven years later, Congress is telling these same thrifts that they cannot count this goodwill toward meeting the new capital standards.

H.R.Rep. No. 54, 101st Cong., 1st Sess., pt. 5, at 27 (1989), *reprinted in* 1989 U.S.Code Cong. & Admin.News 397, 410.

Again, both advocates and opponents of Rep. Hyde's amendment evinced an understanding that the bill would abrogate supervisory goodwill agreements. *Compare* 135 Cong.Rec. H2706 (daily ed. June 15, 1989) (Rep. Crane's statement that FIRREA "would require these S & Ls to write off this goodwill in a scant five years. This legislation violates the present agree-

ments that these institutions made with the Federal Government") *with id.* at H2717 (Rep. Rostenkowski's opinion that "the Federal Government should be able to change requirements when they have proven to be disastrous and contrary to the public interest. The contracts between the savings and loan owners [sic] when they acquired failing institutions in the early 1980's are not contracts written in stone").

Other representatives made similar statements at various times during the debate on FIRREA. *See, e.g.,* 135 Cong.Rec. H2565 (daily ed. June 14, 1989) (Rep. Saxton: "In short[,] goodwill agreements were a mistake and as the saying goes; [sic] 'Two wrongs don't make a right.'"); 135 Cong.Rec. H2783 (daily ed. June 15, 1989) (Rep. Ackerman: "[FIRREA] would abrogate written agreements made by the U.S. Government to thrifts that acquired failing institutions by ... no longer counting goodwill as capital after a 4–year transition period. In effect, the Government is saying, 'Thanks for your help, but we don't need you anymore, so we're breaking our promise'").

After a thorough examination of the conference reports and the floor statements about supervisory goodwill, we are convinced that the statements we have quoted give an accurate picture of the congressional understanding that FIRREA would abrogate supervisory goodwill forbearances such as Guaranty's. Furthermore, we have not found a single reference to Section 401(g), or to anything resembling Section 401(g), in any of the congressional discussions of the treatment of supervisory goodwill. While it is always risky to argue from congressional silence, we are at a loss to understand the sometimes strong denunciations of the bill's treatment of forbearance agreements involving supervisory goodwill—even after it was reported from conference with Section 401(g) included—if members of Congress understood that Section 401(g) served to ensure that a deal would indeed be a deal.

In *Chevron,* the Court concluded that the legislative history there did not speak directly to the precise question at issue. *See Chevron,* 467 U.S. at 862, 104 S.Ct. at 2789

("the legislative history as a whole is silent on the precise issue before us"). Our review of FIRREA's legislative history, however, convinces us that Congress intended that FIRREA's new capital standards abrogate supervisory goodwill forbearances (with the possible exception of any granted under CEBA). Under *Chevron,* "that is the end of the matter; for the court as well as the agency must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781. Not only is the OTS's interpretation that FIRREA eliminates contractual capital and accounting forbearances permissible, the legislative history unambiguously supports that interpretation.

## V. CONCLUSION

We hold that the contract between Guaranty and the agencies was a conditional one, dependant on the applicable regulatory scheme not changing. We further hold that the regulatory scheme did change, and that the OTS acted within its authority in interpreting FIRREA the way it did. As a result, we conclude that the district court erred in finding that Guaranty had a substantial likelihood of success on the merits. We reverse and remand with instructions to the district court to dissolve the preliminary injunction.

REVERSED and REMANDED.