John K. CASTLE, et al., Plaintiffs,

and

Federal Deposit Insurance Corporation, as Successor to the Rights of Western Empire Savings and Loan Association, Plaintiff Intervenor,

v.

The UNITED STATES, Defendant.

No. 90–1291C.

United States Court of Federal Claims.

Feb. 2, 1999.

---

85. *See supra* § C.5.

86. And, if applicable, the rationale for any payments exceeding the CPFF proposed by Chemonics in its second BAFO

John C. Millian, with whom were Paul Blankenstein and James C. Dougherty, Gibson, Dunn & Crutcher LLP, Washington, D.C., for plaintiffs.

Thelma W. Diaz, with whom were John V. Thomas, Stephen J. Kessler and Ellis Merritt, Federal Deposit Insurance Corporation (FDIC), Washington, D.C., for plaintiff-intervenor FDIC.

Ming–Yuen Meyer–Fong, with whom were Paul Freeborne, Linda Halpern, Matthew Lee, Ho Sik Shin, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, and Frank W. Hunger, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This case is before the court on the parties' cross-motions for summary judgment as to liability and on defendant's partial motion to dismiss certain named plaintiffs. The private plaintiffs in this action contend that they had a contract with the government, through the Federal Home Loan Bank Board (FHLBB), to acquire and recapitalize Western Empire Savings and Loan Association (Western Empire) in 1988 in exchange for particular regulatory treatment. Plaintiffs contend that critical components of the contract were breached by the passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L 101–73, 103 Stat. 183, and by the promulgation of its implementing regulations. The thrift was ultimately seized by the government in February 1990. Plaintiff-intervenor Federal Deposit Insurance Corporation (plaintiff FDIC) has brought suit, as the successor in interest, on behalf of the failed thrift.

This case has proceeded under the case management process instituted to manage the so-called *Winstar*-related cases in the wake of the United States Supreme Court's decision in *United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). As such, the court has considered two additional waves of briefing related to this case in resolving the pending motions. First, the court ordered, at the end of its opinion in *California Federal Bank, FSB v. United States*, 39 Fed.Cl. 753 (1997) that the government show cause why summary judgment should not be entered in cases, such as this one, where motions for summary judgment as to liability were pending. The court subsequently ordered a series of responsive briefs as part of this show cause process, and the court has considered those briefs in resolving the pending motions. Second, the court ordered supplementary briefing on Common Issue 11, which dealt with the standing of various investor plaintiffs to sue for breach of contract. The court selected five cases, including this one, to frame and fully ventilate Common Issue 11, and the process culminated in oral argument on the

Common Issue on July 7, 1998. As with the show cause briefing, the court has considered fully the supplementary Common Issue briefing in resolving the pending motions.

As a result of the show cause process, the parties agreed that two issues were left unresolved by the court's opinion in *California Federal,* and defendant and the plaintiffs disagreed as to whether another issue was resolved or not by that opinion. The parties agreed that the status of certain plaintiffs to maintain direct breach of contract actions—the subject of the government's motion to dismiss—was not resolved by *California Federal.* The parties further agreed that defendant's affirmative defense of prior material breach was left unresolved by the court's opinion. The parties disagreed as to whether defendant's grounds for summary judgment—that the agreement expressly assigned the risk of regulatory change to plaintiffs, meaning that the passage of FIRREA could not have breached any contract between the parties (the so-called "successor regulation" argument)—was resolved by the *California Federal* opinion. Because the court agrees that defendant's argument is not foreclosed by the *California Federal* opinion, the court will examine defendant's argument in light of the contractual documents relevant to this transaction in this case.

For the reasons set forth below, the court denies defendant's motion for summary judgment and its alternative motion to dismiss certain named plaintiffs, and grants the motions of private plaintiffs and plaintiff intervenors for partial summary judgment as to liability.

## BACKGROUND

In this case, the parties agree as to many facts which will be recited here unless disputed. In December 1988, plaintiffs John K. Castle and Leonard M. Harlan, who headed the venture capital firm Castle Harlan, Inc., entered into an agreement with the FHLBB and the Federal Savings and Loan Insurance Corporation (FSLIC) to acquire Western Empire Federal Savings and Loan (Western Empire). The agreement, as argued by plaintiffs and conceded by defendant, was memorialized in several documents: the Regulatory Capital Maintenance Agreement (RCMA), with Consent Agreement, signed by Messrs. Castle and Harlan, the FSLIC and the President of Western Empire on December 30, 1988; the Acquisition Approval Letter with attached Conditions, issued by the Federal Home Loan Bank Board on December 30, 1988; and the Business Plan, formulated by Castle Harlan in support of the reorganization plan, submitted by Castle Harlan, Inc. prior to the acquisition.

In short, plaintiffs contend that the agreement memorialized in these documents—the terms of which were heavily negotiated by Castle Harlan and the regulators during mid- and late–1988 according to the undisputed documentary evidence—worked as follows: Castle Harlan would engineer the recapitalization of the bank in exchange for certain capital forbearances and other contractual promises regarding the regulatory capital rules that would apply to Western Empire. Plaintiffs point to four key promises contained in the documents that plaintiffs contend were breached by the passage of FIRREA.

First, plaintiffs contend that the government promised that Western Empire would be permitted to meet the lesser of either the standard regulatory capital requirements as set forth in FHLBB regulations, or a Modified Capital Requirement set forth in the Conditions, for a period of five years.

Second, plaintiffs contend that the government promised that Western Empire could include supervisory goodwill in the calculation of its regulatory capital, to be amortized over a period of not more than 20 years.

Third, plaintiffs contend that the government promised that Western Empire could invest up to 25 percent of its assets in high-yield bonds for the first six months and up to 35 percent of its assets in high-yield bonds thereafter.

Fourth, plaintiffs contend that the Conditions contained the promise that, in order for Western Empire to grow its assets as contemplated in the Business Plan, the government promised that for a period of two years Western Empire would not be subject to the

normal liability growth restrictions contained in FHLBB regulations.

Defendant does not contest that these provisions were contained in the documents evidencing the agreement. Rather, defendant makes two arguments in support of its motion for summary judgment. First, defendant contends that another provision of the acquisition documents shifted the risk of all future regulatory change onto Western Empire. Second, defendant argues that, to the extent that any plaintiffs have a contract with the government, only two of the plaintiffs— Messrs. Castle and Harlan—even arguably have privity with the government regarding the contract at issue. Accordingly, the government moves to dismiss all but plaintiffs Castle and Harlan should its motion for summary judgment fail. Lastly, as an affirmative defense to plaintiffs' motions for summary judgment, defendant argues that, even were the court to find that the government owed the promises alleged by the plaintiffs, the prior material breaches by Western Empire and the plaintiffs prior to the enactment of FIRREA relieved the government of the obligation to perform. The court will address each of the arguments in turn.

## DISCUSSION

### SUCCESSOR REGULATION LANGUAGE

■ Defendant's motion for summary judgment is premised on language contained in Paragraph 7(c) of the RCMA:

All reference to regulations of the Bank Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement.

Defendant contends that this language in the RCMA expressly assigned the risk of regulatory change to plaintiffs. Defendant further cites an 11th Circuit case, *Guaranty Financial Services, Inc. v. Ryan*, 928 F.2d 994 (11th Cir.1991), which found that virtually identical language as that contained in the Western Empire RCMA shifted the risk of future regulatory change onto the thrift. In

what appears to be further support, defendant notes that, in a footnote in the Supreme Court's plurality opinion in *United States v. Winstar*, the Court states:

To be sure, each side could have eliminated any serious contest about the correctness of their interpretive positions by using clearer language. *See, e.g., Guaranty Financial Services, Inc. v. Ryan*, 928 F.2d 994, 999–1000 (1991) (finding, based on different contract language, that the Government had expressly reserved the right to change the capital requirements without any responsibility to the acquiring thrift).

*Winstar*, 518 U.S. at 870 n. 15, 116 S.Ct. at 2452 n. 15. Defendant thus concludes that, because the Western Empire RCMA contains virtually identical language as that found in the *Guaranty* agreement, and given the above-quoted footnote from the Supreme Court's plurality opinion, "the Supreme Court concurred with the Eleventh Circuit's reasoning and holding in *Guaranty*," thus "dictat[ing] a finding that section 7(c) of the RCMA similarly allocated any risk of regulatory change to Western Empire." Def.'s Mot. for Summ.J. and Partial Mot. to Dismiss at 8.

Plaintiffs counter that, when read in the context of the entire agreement between the parties, defendant's interpretation is inconsistent with the plain language of the agreement. Further, plaintiffs argue that, regardless, neither the decision in *Guaranty*, nor the Federal Circuit and Supreme Court *Winstar* decisions, support defendant's argument.

As a preliminary matter, the court notes that neither the Eleventh Circuit opinion in *Guaranty* nor the footnote reference in the Supreme Court's *Winstar* plurality opinion is directly determinative of the issue in this case. Rather, the most that the court can determine from the defendant's citations are two unremarkable, and, in the realm of contract law, indeed axiomatic propositions. The first is that courts interpret contracts. The second is that clear contract language is easier for courts (and parties) to interpret than unclear language.

As the Eleventh Circuit stated, after determining that the risk of regulatory change

fell on the thrift in the *Guaranty* case, in summarizing its conclusions:

> This interpretation, unlike Guaranty's, harmonizes the various provisions of the contract instead of placing them in conflict, and is therefore preferable to Guaranty's reading.

928 F.2d at 999. The Eleventh Circuit states a standard rule of contract interpretation: the court should endeavor to give reading to the contract that "harmonizes the various provisions of the contract instead of placing them in conflict". The Supreme Court's footnote reference to the *Guaranty* decision is put forward, it seems, in support of the idea that clear and unambiguous contract language will allow the parties to make the deal they really want and have it enforced that way. This is a far cry from defendant's conclusion that the footnote reference to the *Guaranty* decision mandates a finding that the successor regulation provision in the Western Empire transaction shifts the risk of all regulatory changes, onto plaintiffs.

Rather, the court must read the successor regulation provision in light of the entire contract between Western Empire and the government, in order to, as the Eleventh Circuit notes in *Guaranty*, "harmonize[ ] the various provisions of the contract instead of placing them in conflict." Thus, the mere fact that a similar provision existed, and was relied upon by the court in *Guaranty*, is simply not dispositive in this case. Nor is it particularly relevant, unless all the elements comprising the parties' agreement, not just the so-called successor regulation clause, are very similar to those involved in *Guaranty*. As the Eleventh Circuit clearly stated, the successor regulation provision was read in terms of the entirety of the agreement before it. The court must endeavor to do the same regarding the Western Empire transaction, and nothing in the *Guaranty* decision or the Supreme Court's *Winstar* decision counsels otherwise.

Plaintiffs argue that the successor regulation clause can be squared with, and indeed is consistent with, the rest of the agreement. Paragraph 1 of the Conditions for the Approval of Control (Conditions) states:

> 1.(a) The modified computation in (b) below may be used by New Western Empire to calculate the required level of Regulatory Capital in lieu of that which is required under Section 563.13 of the Insurance Regulations....
>
> (b) The Required Regulatory Capital Level may for a period not to exceed *five years* be equal to the lesser of:
>
> (1) The Association's Regulatory Capital Requirement as set forth in the applicable Insurance Regulations in force at any compliance date; or
>
> (2) The Modified Capital Requirement as of any compliance date computed as follows ...

(emphasis in original). Plaintiffs argue that this provision clearly permits that Western Empire can meet the Modified Capital Requirement in lieu of current or further regulations. Those regulations may change, and they may change in such a way that increases or decreases the obligations of Western Empire. This would happen if, for example, the applicable insurance regulations were lower than the Modified and Capital Requirement, and they were then changed to raise that rate. Under that circumstance, plaintiff would be required to meet the higher rate consistent with Paragraph 1 of the Conditions. Thus, plaintiff argues, the generalized successor regulation provision of the RCMA can be read consonant with the Modified Capital Requirement provision. The successor regulation provision put the parties on notice that regulations "may" change obligations, the argument goes; it does not trump the specific contractual rights set forth to meet capital levels as specified in Paragraph 1 of the Conditions.

Defendant has no real response to this contract interpretation, except to repeat that the successor regulation provision simply shifted the risk of regulatory change to plaintiffs. This, as plaintiffs quite correctly point out, not only is contrary to a plain reading of the contractual terms, but also would render the centerpiece of this agreement absurd. Defendant would have the court accept an interpretation whereby a very specific provi-

sion of the agreement setting forth the unique means by which the thrift may meet its capital standards, and designed to induce capital investment in the thrift and to permit the thrift the flexibility in the near term to turn the fortunes of Western Empire around, could be destroyed at any time for any reason. It is unreasonable to believe that anyone, least of all Castle Harlan, would agree to a provision that would enable its contracting partner to vitiate the essence of the deal at any time. More importantly, on its face defendant's interpretation is inconsistent with the plain language of the agreement, and accordingly defendant's motion for summary judgment must be denied.

## MOTION TO DISMISS CERTAIN PLAINTIFFS

In the event defendant's motion for summary judgment was not granted, defendant moved to dismiss all plaintiffs except Messrs. Castle and Harlan, who were the only two party plaintiffs who signed the RCMA in their individual capacities, and hence, according to the government, who can even argue that they had privity of contract with the government. There is no dispute that none of the other plaintiffs in their individual capacities signed the documents evidencing the agreement. Plaintiff FDIC, in its response to the motion to dismiss, agreed with the government that all plaintiffs except Messrs. Castle and Harlan should be dismissed because of lack of privity.

Private plaintiffs make three general responses to the privity argument. First, plaintiffs, relying primarily on *Far West Federal Bank, S.B. v. Office of Thrift Supervision,* 119 F.3d 1358 (9th Cir.1997), argue that, when the entire transaction is properly understood, they are either parties, or at least third party beneficiaries, of the contract. Second, plaintiffs argue that, regardless, Judge James T. Turner has ruled that, under 12 U.S.C. § 1821(d)(11), shareholder plaintiffs have a direct interest in any surplus that would result from a recovery to the thrift, and therefore have standing to sue. Third, plaintiffs observe that defendant's motion simply does not address whether the plaintiffs can maintain their claims for takings under the Fifth Amendment.

As to the second and third of these arguments the court concurs. Judge Turner has already ruled that shareholder plaintiffs in these cases have standing to participate in the litigation pursuant to 12 U.S.C. § 1821(d)(11) and citing the holdings in *Branch v. United States,* 69 F.3d 1571, 1575 (Fed.Cir.1995), *cert. denied* 519 U.S. 810, 117 S.Ct. 55, 136 L.Ed.2d 18 (1996), and *California Housing Sec., Inc. v. United States,* 959 F.2d 955, 957 n. 2 (Fed.Cir.1992), *cert. denied,* 506 U.S. 916, 113 S.Ct. 324, 121 L.Ed.2d 244 (1992). The court need not revisit that issue. Similarly, plaintiffs are correct that their taking claims survive regardless of defendant's motion to dismiss, since defendant's motion simply does not address the issue of whether any or all of the plaintiffs can maintain takings claims apart from the breach of contract claims.

The remaining question the court needs to address is whether plaintiffs other than Messrs. Castle and Harlan may maintain their direct breach of contract claims. The government repeats, mantra-like, the settled rule that the shareholders, if suing in a non-derivative capacity, must be parties or third party beneficiaries to the contract. Plaintiffs never dispute this settled rule, but argue instead that they are either parties to the contract or third party beneficiaries.

*Far West* is instructive because the case is factually similar to the one at hand. In *Far West,* the investors, Far West, the FHLBB and the Federal Home Loan Bank of Seattle entered into a series of agreements in 1987, whereby the investors agreed to infuse new capital into Far West (in the form of stock), which was contingent on the conversion of Far West from a mutual into a stock association. *Far West,* 119 F.3d at 1361. As part of this series of agreements Far West was granted, among other things, the right to treat an intangible asset (a newly created credit line) as an intangible asset, which could be used to meet a Modified Regulatory Capital Requirement in lieu of existing regulatory capital requirements for a period of ten years. None of the investor plaintiffs in *Far West* in an individual capacity signed the Conversion Agreement, which established the Modified Regulatory Capital Require-

ment. *Id.* at 1362. The Ninth Circuit held that the investor plaintiffs had standing to sue for rescission of the agreement and restitution of their investment.

In *Far West*, the FDIC had argued that the investor plaintiffs did not have standing to sue because the investors did not sign the Conversion Agreement in their individual capacities, but only as directors of Far West. The FDIC argued, as does the government here, that any injuries suffered were suffered by Far West, and that the investors are simply shareholders who are attempting to recover for the harm suffered by the corporation. *Id.* at 1363. The Ninth Circuit strongly disagreed:

> FDIC's argument ignores the nature and circumstances of the entire agreement among the Investors, Far West, FHLBB, and FHLB—Seattle. At the time of the Conversion Agreement, FHLBB made promises to entice the Investors to recapitalize Far West. FHLBB's inability to continue to regulate Far West in accord with those promises unquestionably injured the investors, who were induced by the FHLBB's promises to pour $26.6 million into a failing thrift.

> Under the Restatement, a third party who is an intended beneficiary of a contract may sue to enforce the contract or to obtain an appropriate remedy for breach. See Restatement (Second) of Contracts § 304 (1981). The Conversion Agreement specifically identifies both Far West and its prospective shareholders as intended beneficiaries of FHLBB's promises. Furthermore, as discussed above, the circumstances of the transaction indicate that all of the parties intended the benefits of FHLBB's promises to run to the Investors, so that the Investors would be inclined to risk their money in Far West. In sum, even though the Investors were not signatories to the Conversion Agreement itself, it is clear that the sole purpose of the entire transaction among the Investors, Far West, FHLBB, and FHLBB–Seattle was for the Investors to invest $26.6 million in Far West in exchange for promises by the FHLBB to regulate Far West in a manner that would make their

investment financially sound. To deny the Investors an opportunity to recover for FHLBB's breach simply because Far West and not the Investors signed one of the documents evidencing those promises would place the form of the agreement over its substance. We decline to take such a formalistic and narrow view of the parties' agreement.

*Id.* at 1363–64 (footnote omitted).

Investor plaintiffs argue that the "nature and circumstances" of their agreement mirror those of the agreement in *Far West*. Like the Far West investors, the investors, save Messrs. Castle and Harlan, did not sign any of the documents evidencing the agreement. However, the plaintiffs contend, and defendant does not really dispute, that the purpose of this series of agreements, as in *Far West*, was to induce the investors to infuse capital in a failing thrift in exchange for regulatory treatment that "would make their investment financially sound." Plaintiffs therefore argue that, consistent with the logic of *Far West*, the investors were parties to, or third party beneficiaries of, the contract.

Defendant makes several arguments as to why *Far West* is not relevant to the instant dispute. Defendant points out that *Far West* is a Ninth Circuit case, and the court should follow what defendant believes is consistent precedent in this Circuit. Defendant cites several cases, including *Suess v. United States*, 33 Fed.Cl. 89, 94 (1995), *Robo Wash, Inc. v. United States*, 223 Ct.Cl. 693, 697 (1980), and *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 662, 428 F.2d 1241 (1970, in support of the "settled proposition that privity of contract—and, therefore, standing to sue in a non-derivative capacity—cannot be established unless the claimant identifies a duty and an injury running *directly* to him or her.") Def.'s Consol. Reply at 14. The precedent, while accurately cited, states a general rule that is irrelevant to plaintiffs' argument in favor of standing. Plaintiffs concede the rule, but point out it is irrelevant in this case, because the investor plaintiffs assert that they were parties to the contract or third party beneficiaries of the contract.

Defendant makes two additional factual distinctions in *Far West* that it believes render the case inapposite. First, defendant observes that the documents evidencing the agreement in this case do not specifically identify the investors as intended beneficiaries, as did the *Far West* Conversion Agreement. This is indisputable but once again hardly dispositive. The Ninth Circuit did note that the Conversion Agreement specifically identified the stockholders as intended beneficiaries, but this only is a point in support of a finding that the stockholders were intended beneficiaries, not a legal rule. The court cannot divine a legal requirement that beneficiaries be specifically identified from the Ninth Circuit's opinion; moreover, such a rule would be flatly contrary to the law of this Circuit. In *Montana v. United States,* 124 F.3d 1269 (Fed.Cir.1997), the Federal Circuit stated that "[t]he intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefited thereby." *Id.* at 1273.

Defendant's second factual distinction is simply erroneous. Defendant contends that an "unusual sequence of events" in *Far West* distinguish the case from the present one. Defendant states: "The shareholders in *Far West* invested monies in an institution that had been placed under FDIC restrictions *after* the enactment of FIRREA." Def's Consol. Reply at 18. Notwithstanding the ambiguity of this sentence, it is incorrect however one reads it. The *Far West* investors capitalized Far West in 1987; FIRREA passed in 1989. The lawsuit was prompted by regulatory action threatened against Far West by the Office of Thrift Supervision as a result of FIRREA's new capital requirements. In sequencing terms, these actions are identical to those in this case: plaintiffs invested money, FIRREA passed and breached the terms of the contract, and plaintiffs filed suit.

Once again, defendant's objections do not go to the actual issue remaining: whether all the investor plaintiffs except Messrs. Castle and Harlan have standing to sue as either parties to the contract or as third party beneficiaries of the contract. The court believes that these investor plaintiffs are not parties, but are third party beneficiaries of the contract. This is clear after a quick review of the nature and circumstances of the transaction. The parties to the transaction were Messrs. Castle and Harlan, the FHLBB and the FSLIC. The very purpose of the contract, however, as clearly spelled out in the Business Plan of Castle Harlan (and in essence undisputed by the government), was to enshrine a modified regulatory regime under which Western Empire would operate that would induce investors to recapitalize the thrift. The capital these investors would provide was the linchpin of the agreement, not the nominal $2000 Messrs Castle and Harlan paid for the value of the common stock. It was for the investors' benefit, to induce their investments, that the government made its promises.

As the Federal Circuit said in *Montana v. United States,* 124 F.3d 1269 (Fed.Cir.1997), in order to qualify as a third party beneficiary, "the contract must 'reflect the express or implied intention of the parties to benefit the third party.'" *Id.* at 1273. What's more, as stated previously "intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefited thereby." *Id.* It is clear to the court that the "implied intention" of the parties was to benefit the investors, and that they fall within the class—indeed they comprise the entirety of the class—that was intended to benefit from the government's promises. Defendant's motion to dismiss is accordingly denied.

## PRIOR MATERIAL BREACH DEFENSE

Defendant argues that, even if the court should find that there is a contract, its performance can be excused because of prior material breaches by Western Empire. Defendant points to two actions in the record that it believes evidence prior material breaches. The first is its contention that Western Empire failed to meet the 2 percent tangible capital requirement, and failed to cure the capital deficiency in 90 days, as required by Sections 2(g) and 2(h) of the RCMA. The second prior material breach cited by defendant is Western Empire's alleged failure to abide by two requirements

contained in Section 4(a) of the Conditions for Approval: the first is a requirement to provide quarterly reports which include identification of any material variances from the business plan; the second requires prior written approval of the Supervisory Agent of "any proposed material change or deviation from the operating format as presented in the Business Plan."

The court need not spend any time evaluating the standards for whether a breach is material, since the record squarely contradicts defendant's first grounds for asserting this defense and provides absolutely no evidence whatsoever in support of the second. As to the failure to meet the capital deficiency, the documents relied upon by the government argue against there being a breach, material or not. The government contends that Western Empire was capitally deficient as of June 5, 1989, and that it failed to cure that deficiency within the prescribed 90 days. The only problem is that the Exam Report of the Office of Thrift Supervision (an agency, incidentally, that did not exist prior to the August 6, 1989 passage of FIRREA), clearly states otherwise.[1] Western Empire was clearly compliant with its agreement when FIRREA was passed. As to Western Empire's alleged failure to either notify federal regulators or seek approval for material deviations, the record citations relied upon by defendant are not inconsistent with Western Empire's obligations pursuant to the Conditions for Approval. Most tellingly, there is no evidence that the regulators considered these to be violations of plaintiffs' obligations.[2]

1. "The institution's board and management were notified of the deficiency in a letter dated *September 12, 1989,* and directed to cure such deficiency within 90 days as required within the Capital Maintenance Agreement." Under the government's current interpretation, the cure period would have ended September 5, 1989. Defendant's curious interpretation would mean that the OTS provided a 90-day notice to cure seven days after the cure period had expired! This interpretation can only be described charitably as odd.

2. The government relies upon two examples The first is a line in the OTS Exam Report noting "significant discrepancies" between the income projected in the operating plan and the actual

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment and motion to dismiss are denied, and the motions for summary judgment as to liability of the investor plaintiffs, and the FDIC as successor in interest to the rights of New Western Empire Savings and Loan Association, are granted.

It is further ORDERED that, pursuant to RCFC 77(f), the Omnibus Case Management Order (September 18, 1996) and the Priority Cases Pretrial Scheduling Order (April 2, 1997), this case is assigned for all further proceedings to Judge John P. Wiese as Trial Judge.

**IT IS SO ORDERED.**

results as of June 30, 1989. It says nothing about failure to notify or get approval of deviations to the business plan. The second is a passing footnote reference to Western Empire's acknowledged loan-to-one-borrower violation prior to the enactment of FIRREA. As plaintiffs point out, the violation was quickly cured, and the government never contended that this was a material breach that excused its non-performance prior to the initiation of this lawsuit. It also is preposterous to believe, as plaintiffs point out, that the investors' $15 million investment could stand or fall on every such minor regulatory issue. Most relevantly, the contracting parties clearly did not think, or act, as if it did.