STERLING SAVINGS, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 95–829 C.

United States Court of Federal Claims.

Sept. 12, 2002.

William D. Symmes, Spokane, WA, counsel of record for plaintiffs, with whom were Leslie R. Weatherhead and William M. Symmes.

Elizabeth M. Hosford, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, counsel of record for defendant, with whom were Jeanne E. Davidson, Deputy Director, David M. Cohen, Director, and Stuart E. Schiffer, Deputy Assistant Attorney General.

## OPINION

DAMICH, Chief Judge.

Before the Court in this *Winstar*-related case are the parties' motions for summary judgment as to liability and Defendant's motion to dismiss Plaintiff Sterling Financial Corporation. At issue is whether Defendant breached contractual obligations to Plaintiff with respect to Sterling Savings Association's acquisition of Lewis Federal Savings & Loan Association of Chehalis, Washington, ("Lewis") in 1985, Tri–Cities Savings & Loan Association of Kennewick, Washington, ("Tri–Cities") in 1988, and Central Evergreen Federal Savings & Loan Association of Chehalis, Washington, ("Central Evergreen") in 1988. For the reasons enumerated below, Plaintiff's motion for partial summary judgment as to liability is GRANTED and Defendant's partial motion to dismiss is GRANTED in part, DENIED in part and its motion for summary judgment is GRANTED in part and DENIED in part.

## I. Background

On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"). Pub.L. No. 101–73, 103 Stat. 183, codified, in relevant part, at 12 U.S.C. § 1464. FIRREA "(1) abolished the Federal Savings and Loan Insurance Corporation (FSLIC) and transferred its functions to the other agencies; (2) created a new thrift deposit insurance fund under the Federal Deposit Insurance Corporation (FDIC); (3) eliminated the [Federal Home Loan] Bank Board (FHLBB) and replaced it with the Office of Thrift Supervision (OTS), an office within the Department of Treasury, and made the OTS Director responsible for the regulation of all federally insured savings associations and the chartering of federal thrifts; and (4) established the Resolution Trust Corporation (RTC), which was charged with closing certain thrifts." *Winstar Corp. v. United States,* 64 F.3d 1531, 1538 (Fed.Cir.1995) (paraphrasing 12 U.S.C. §§ 1437 note, 1441a, 1821) ("*Winstar*

*II* "). FIRREA required OTS to "prescribe and maintain uniformly applicable capital standards for savings associations." 12 U.S.C. § 1464(t)(1)(A). It also expressly restricted the continued use of supervisory goodwill to satisfy regulatory capital requirements. It did so by establishing three new capital standards: core capital, tangible capital and risk-based capital. 12 U.S.C. § 1464(t). Pursuant to these standards, supervisory goodwill could not be included in satisfying tangible capital, and had to be amortized on a 20–year basis in calculating risk-based and core capital. *Id.*

Many thrifts had become accustomed to recording supervisory goodwill on their books. Because FIRREA prohibited them from continuing this practice, the affected thrifts recorded unanticipated decreases in the asset portions of their books. *Winstar Corp. v. United States* involved three thrifts that had brought forward breach of contract claims against the Government in the Court of Federal Claims, and had their cases consolidated for the purpose of their interlocutory appeal. *Winstar II*, 64 F.3d at 1534. They alleged that the Bank Board had promised that they could count supervisory goodwill toward regulatory capital requirements, and that the passage of FIRREA constituted a breach of those promises. *Id.*

The Federal Circuit upheld Judge Smith's determination that: (1) the government had entered into either express or implied-in-fact contracts allowing these three thrifts to record supervisory goodwill as regulatory capital; and that (2) these promises had been breached by the enactment of FIRREA. *Id.* The Supreme Court affirmed. *United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (*"Winstar III"*).

In this case, Plaintiff argues that the Government entered into contracts with it regarding three thrift acquisitions.[1] Each transaction will be discussed in turn.

### A. Lewis

Lewis was a failed thrift that was taken over by the Federal Savings and Loan Insur-

ance Corporation ("FSLIC") in 1985. On November 5, 1985, Plaintiff acquired Lewis from FSLIC. The following four documents are particularly relevant to Plaintiff's contractual claims: (a) an Acquisition Agreement, (b) an Assistance Agreement, (c) Resolution 85–985 of the Federal Home Loan Bank Board ("Bank Board" or "FHLBB"), and (d) a forbearance letter from FSLIC. Plaintiff did not invest any money in the acquisition. Instead, FSLIC, in its corporate capacity, agreed to contribute $1.75 million as well as other financial consideration. Pl.'s Mot. for Partial Summ.J. ("Pl.'s Mot.") at App. A–6, §§ 3, 4. The Bank Board resolution approved Plaintiff's acquisition of most of Lewis, authorized FSLIC to enter into the Assistance Agreement, and directed a forbearance letter be sent to Plaintiff. The resolution states in relevant part:

> RESOLVED FURTHER, That the proposed Assistance Agreement is hereby approved, and the Director is authorized to execute on behalf of the FSLIC an Assistance Agreement in the form or substantially in the form of the proposed form of such Agreement ...

> RESOLVED FURTHER, That the FSLIC hereby approves ... Sterling's inclusion of the FSLIC's $1,750,000 cash contribution to Sterling, pursuant to the terms of the Assistance Agreement, as net worth;

> \* \* \* \* \* \*

> RESOLVED FURTHER, That the Secretary or an Assistant Secretary is authorized and directed to send to Sterling a letter, substantially in the form of a letter ... concerning forbearance by the Bank Board and the FSLIC with respect to certain regulatory requirements....

Pl.'s Mot. at App. A–2, 5–6.

The forbearance letter contains three forbearances. One of the forbearances relevant to this case involved an agreement to forbear, for five years, FSLIC's exercise of its

---

1. At oral argument, Plaintiffs' counsel conceded that Plaintiff Sterling Financial Corporation, the parent of Sterling Savings, is not in privity of contract with Defendant. Tr. at 11. Accordingly, any contractual claim by Sterling Financial is dismissed. All foregoing references to Plaintiff in this opinion refer only to Sterling Savings.

authority over any failure of Plaintiff to meet the net worth requirements arising from Sterling's assumption of Lewis's liabilities. Pl.'s Mot. at App. A–7, 1–2. Specifically, FSLIC agreed to:

> ... forbear, for a period of five years following consummation of the Acquisition, from exercising its authority, under Section 563.13 of the Insurance Regulations, for any failure of Sterling to meet the net worth requirements of Section 563 13 arising solely from (1)(a) scheduled items attributable to the assets of Lewis' existing at the Effective Date, (b) any reduction in net worth resulting from losses on assets or losses on continuing operations acquired in connection with the Acquisition, and (c) any increase in liabilities of Sterling as of the Effective Date by reason of Sterling's assumption of liabilities; *or* (2) Sterling's assumption of the net worth deficiency of Lewis as of the Effective Date.

Pl.'s Mot. at App. A–7 at 2.

The forbearance letter also contained the following limitation provision:

> The forbearances or waivers extended by this letter do not relieve Sterling of its continuing obligations to maintain records of its net worth condition and to report its financial condition in accordance with applicable regulatory requirements. This letter does not and shall not be construed to constitute forbearance or wavier by the Bank Board or the FSLIC with respect to any regulatory or other requirements other than those encompassed within the preceding paragraphs 1 through 3. Other than the actions to enforce the regulatory requirements waived *in accordance with* paragraphs 1 through 3 and the statutory provisions authorizing imposition of the waived requirements, insofar as such requirements are waived, the Bank Board and the FSLIC expressly reserve all their statutory rights and powers with respect to Sterling. . . .

Pl.'s Mot. at App. A–7, 2.

The forbearance letter also confirmed the manner in which the goodwill arising from *the transaction and the* FSLIC *cash* contribution could be counted in issuing reports to the Bank Board or the FSLIC:

This letter will also confirm that:

1. It is the FSLIC's intention that the cash contribution to be made to Sterling pursuant to an assitance [sic] agreement ("Assistance Agreement") to be entered into between the FSLIC and Sterling is to be a credit to Sterling's net worth; therefore, for regulatory accounting purposes, Sterling may book such contribution as a direct addition to its net worth.

2. For purposes of reporting to the Bank Board, the value of any intangible assets resulting from accounting for the Acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 40 years by the straight line method.

3. For purposes of reporting to the Bank Board, any discount, arising from the adjustment of Lewis' mortgage loan portfolio to its fair value, shall be amortized to income by the level yield method assuming contractually required payments will be received for 15 years, and the remaining balance will be repaid at the end of the 15th year. This amortization policy will be followed regardless of the actual repayment characteristics of the loans over time.

Pl.'s Mot. at App. A–7, 2–3.

In the Assistance Agreement between the FSLIC and Plaintiff, FSLIC agreed to pay a cash contribution in the amount of $1,750,000. Pl.'s Mot. at App. A–6, § 3(a)(1). The Assistance Agreement also provided that the cash contributions *could be reported to the Bank Board, except for* those reports that were required to be governed according to generally accepted accounting principles ("GAAP").

> For purposes of reports to the Bank Board other than reports or financial statements that are required to be governed by generally accepted accounting principles, all cash contributions made under this § 3 shall be credited to the ACQUIRING ASSOCIATION's net worth account. It is understood by the parties that the preceding sentence is not intended to address in any

way the accounting treatment of contributions from the [FSLIC] that must be reflected in any filing that the ACQUIRING ASSOCIATION may make, whether to the Bank Board or not, that requires the submission of financial statements prepared in accordance with generally accepted accounting principles.

Pl.'s Mot. at App. A–6, § 3(a)(2).

The Assistance Agreement also contained an integration clause which specifically referenced Bank Board resolutions and letters:

This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only the Acquisition Agreement and any resolution or letters concerning the Acquisition or this Agreement issued by the Bank Board or the [FSLIC] in connection with the approval of the Acquisition and this Agreement. . . .

Pl.'s Mot. at App. A–6, § 14.

Accordingly, Resolution 85–985 of the Bank Board, the Bank Board forbearance letter in connection with the Lewis transaction, and the Acquisition Agreement all are incorporated into the Assistance Agreement.

Thus, Plaintiff claims that the FSLIC and the Bank Board contracted with it:

- to pay Plaintiff cash assistance in the amount of $1.75 million and to attribute that cash assistance as regulatory capital;
- to permit Plaintiff to record Lewis's negative net worth as goodwill and amortize it for forty years; and
- to forbear, for five years after the transaction, from exercising its regulatory authority against Plaintiff for any failure to meet regulatory capital if the cause of the failure was the assumption of Lewis's net worth.

### B. Tri–Cities

In 1987 Tri–Cities failed. In response to a bid package sent by FSLIC to Plaintiff, it acquired Tri–Cities in 1988. The relevant documents relating to the contractual claims arising from this transaction are: (i) Bank Board Resolution No. 88–250, which approved the transaction, (ii) an Assistance Agreement, (iii) a forbearance letter from the Bank Board, and (iv) an Acquisition Agreement. On April 6, 1988, the Bank Board issued Resolution No. 88–250, which approved the acquisition of Tri–Cities, authorized an assistance agreement, and directed that a forbearance letter be sent to Plaintiff. Pl.'s Mot. at App. B–2, 8. The Bank Board resolution provided in relevant part:

RESOLVED FURTHER, That the Acquisition shall be accounted for, and the Acquiring Association shall report to the Bank Board and the FSLIC, in accordance with generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC, except to the extent authorized in the forbearance letter. . . .

*Id.*

The Bank Board issued a forbearance letter on April 6, 1988, which contained the following forbearances relevant to this case:

1. *Capital Requirements* The Federal Savings and Loan Insurance Corporation ("FSLIC") will forbear, for a period of five years following consummation of the acquisition, from exercising its authority, under Section 563.13 of the Rules and Regulations for FSLIC–Insured Institutions; for any failure of Sterling to meet the capital requirements of Section 563.13 arising solely from (1)(a) any increase in the contingency component attributable to the assets of Tri–Cities existing at the effective date, and (b) any increase in the net growth of Sterling as of the Effective Date by reason of Sterling's assumption of Tri–Cities' liabilities; or (2) Sterling's assumption of the capital deficiency of the disappearing institution as of the Effective Date.

\* \* \* \* \* \*

4. *Regulatory Capital* It is the FSLIC's intention that the initial cash contribution be made to Sterling pursuant to

the Assistance Agreement is to be a credit to Sterling's regulatory capital; therefore, for regulatory accounting purposes, Sterling may book such contribution as a direct addition to its capital.

5. *Amortization of Unidentified Intangibles* For purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 15 years by the straight line method.

6. *Amortization of Loan Discount* For purposes of reporting to the Board, any discount, arising from the adjustment of Tri–Cities mortgage portfolio to its fair value, shall be amortized to income by the level yield method assuming contractually required payments will be received for eight years, and the remaining balance will be repaid at the end of the eighth year or by the level yield method over the average remaining life of the acquired portfolio, with the discount adjusted annually to reflect the actual prepayment experience of the portfolio.

Pl.'s Mot. at App. B–1, 1–2.

The Assistance Agreement between FSLIC and Plaintiff, dated April 8, 1988, terminated five years after its effective date. Pl.'s Mot. at. App. B–5, §§ 1(y); 18(a). The Assistance Agreement provided that the FSLIC would pay Plaintiff a cash contribution of $11,730,128 five days after the effective date of the transaction. Pl.'s Mot. at App. B–5, § 3(a)(1). The Assistance Agreement also provided that the cash contribution would be credited towards regulatory capital except for reports which were required to be filed in accordance with GAAP.

For purposes of reports to the Bank Board other than reports or financial statements prepared for reporting or disclosure purposes that are required to be governed by GAAP, the cash contribution made under § 3(a)(1), shall be credited to the ACQUIRING ASSOCIATION's regulatory capital account and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulations. 12 C.F.R. § 561.13 (1987). It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from the [FSLIC] that must be reflected in any filing that the ACQUIRING ASSOCIATION may make, whether to the Bank Board (for reporting or disclosure purposes) or otherwise, that requires the submission of financial statements prepared in accordance with GAAP.

Pl.'s Mot. at App. B–5, § 3(a)(2).

The Assistance Agreement also included an integration clause, which explicitly incorporated FSLIC or Bank Board resolutions and letters, and the Acquisition Agreement into the Assistance Agreement:

This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only resolutions or letters *concerning the Acquisition or this Agreement* issued by the Bank Board or the [FSLIC] in connection with the approval of the Acquisition and this Agreement.

Pl.'s Mot. at App. B–5, § 21(a).

In sum, Plaintiff argues that Defendant entered into a contractual obligation:

● to pay Plaintiff cash assistance of $11.7 million and to allow Plaintiff to attribute the $11.7 million as an item of capital on its books, for the purpose of regulatory compliance;

● to allow Plaintiff to record the entire amount of Tri–Cities' negative net worth as goodwill to be included in Plaintiff's net worth and to be amortized over 15 years; and

● to forbear, for five years after the transaction, from exercising its regulatory authority against Sterling for failing to meet any regulatory ratio if the failure was caused by the acquisition or assumption of Tri–Cities' negative net worth.

## C. Central Evergreen

In December 1988, Plaintiff acquired Central Evergreen. In this transaction, the Bank Board, like in the Lewis and Tri–Cities transactions, issued a resolution approving the acquisition and entered into an agreement governing the maintenance of regulatory capital. Unlike the other two transactions, however, no forbearance letters were issued and no cash assistance was provided by FSLIC. Nevertheless, Plaintiff argues that a contract was formed by means of: (a) Bank Board Resolution 88–1273, (b) a reciprocal resolution by Plaintiff's board of directors, and (c) Plaintiff's business plan of operating the merged institutions, which was attached to an agreement between it and FSLIC and was referenced in the Bank Board resolution.

Resolution 88–1273 of the Bank Board provided as follows:

> WHEREAS, the Board hereby finds and determines that all of the transactions approved herein are instituted for supervisory reasons and are necessary to prevent the probable failure of [Central Evergreen];
>
> \* \* \* \* \* \*
>
> NOW, THEREFORE IT IS RESOLVED, ... [that the merger application be approved] provided that the following conditions are complied with to the satisfaction of the Supervisory Agent:
>
> \* \* \* \* \* \*
>
> 4. That within 30 days after consummation of the conversion and merger the Resulting Institution shall furnish analyses satisfactory to the Supervisory Agent, accompanied by a concurring opinion from its independent public accountant, that the transaction was consummated in accordance with generally accepted accounting principles, which (a) specifically describes, as of the effective date of the acquisition, any intangible assets including goodwill, and the discount of assets arising from the acquisition to be recorded; (b) substantiates the reasonableness of amounts attributed to intangible assets and the discount of assets and the related amortization periods and methods;
>
> 5. That prior to the consummation of the merger and conversion the board of directors of the Resulting Institution shall ratify the terms and conditions of this approval resolution and the terms of the proposed conversion and merger and, within 30 days thereof, shall submit a certified copy of the board of director's resolution to the Supervisory Agent;
>
> 6. That prior to consummation of the proposed transaction, the Resulting Institution shall execute a written agreement with the [FSLIC] that for a period of five years following the date of the acquisition (i) Resulting Institution will operate within the scope of the business plan provided in this application, as amended, and/or obtain prior written approval from the Supervisory Agent of any changes which would cause Resulting Institution to materially deviate from the business plan; and (ii) within 30 days of the date of the close of each calendar quarter, Resulting Institution shall submit to the Supervisory Agent a variance report in the format of the business plan's pro forma financial statements explaining any material deviation from the approved business plan.
>
> \* \* \* \* \* \*
>
> 8. That Sterling shall agree in writing with the [FSLIC] to infuse capital as necessary to enable the institution to continue to maintain its regulatory capital requirement pursuant to 12 C.F.R. § 563b.13 as currently in effect or as hereafter amended, and to infuse capital from its planned stock offering, or by an equivalent method, no later than two years from the date of acquisition, in order to meet the scheduled increases of capital as set forth in the business plan. Sterling shall also agree that, during the 5 year period of the agreement commencing on the date of acquisition, upon failure to achieve regulatory and GAAP capital

levels consistent with the scheduled increases of capital as set forth in the business plan or failure to comply in all material respects with the business plan, the institution shall be subject to such sanctions....

Pl.'s Mot. at App. C–6, 1, 3–4.

Plaintiff's board of directors responded with its own resolution dated December 22, 1988. It stated in relevant part:

WHEREAS, the FHLBB resolution requires, among other things, that prior to the consummation of the merger and conversion contemplated by the Acquisition Agreement, the Board of Directors of this corporation, as the resulting institution, under the Acquisition Agreement ratify the terms and conditions of the FHLBB Resolution as well as the terms of the proposed conversion and merger;

NOW, THEREFORE, IT IS:

RESOLVED that the terms and conditions of the FHLBB Resolution are hereby agreed to and ratified;

BE IT FURTHER RESOLVED that the officers, or any one of them, are hereby directed and empowered to act on behalf of this corporation in fulfilling the terms and conditions of the FHLBB Resolution including, without limitation, the execution of a written agreement which provides that for a period of five (5) years following the date of the acquisition, this corporation will operate within the scope of the business plan which was provided in connection with the application to the Federal Home Loan Bank Board and to provide reports to the supervisory agent for the Federal Home Loan Bank Board in accordance with said written agreement, as well as all other terms and conditions of the FHLBB Resolution....

Pl.'s Mot. at App. C–4, 1.

The business plan, attached to the December 28, 1988, agreement between FSLIC and Plaintiff, consisted of a series of quarterly proformas in which Plaintiff issued financial projections for the period through June 1991. The proformas accounted for the inclusion of the negative net worth of Central Evergreen among assets. The line item for supervisory goodwill, styled "INTANGIBLE ASSETS," was projected to increase by $20.9 million as of December 1988, which reflects the addition of the negative net worth of Central Evergreen. Pl.'s Mot. at App. C–3, A–3.

However, the December 28, 1988, agreement also provided that "[all] references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirer's obligation under this agreement." Pl.'s Mot. at App. C–3, § V.D. In addition, the same agreement provided that it was "not a waiver of or forbearance from any applicable regulation." Pl.'s Mot. at App. C–3, § V.M. Moreover, Plaintiff was required to:

... cause its Regulatory Capital to be maintained at a level at or above the Minimum Capital Requirement, and as necessary will raise Additional Capital, in a form satisfactory to the Supervisory Agent, in an amount necessary to restore its Regulatory Capital to a position where it meets its Minimum Capital Requirement whenever its Regulatory Capital falls below the lesser of its Minimum Capital Requirement or the Regulatory Capital projected in the Business Plan.

Pl.'s Mot. at App. C–3, § III.A.

Pursuant to a letter dated January 27, 1989, the accounting firm of Coopers & Lybrand stated that Plaintiff allocated approximately $23,800,000 to an intangible asset, or goodwill, in conjunction with the acquisition of Central Evergreen. Pl.'s Mot. at App. C–2, 2. It also stated that the goodwill would be amortized for 12 years in accordance with the requirements of the Statement of Financial Accounting Standards No. 72. *Id.*

In sum, Plaintiff maintains that the Government contracted with it:

● to permit Plaintiff to operate, in the five years following the agreement, at the lesser of either (i) a capital ratio prescribed by any future regulation or (ii) the capital projected in the business plan attached to the agreement between Plaintiff and FSLIC;

- to permit Plaintiff to record Central Evergreen's negative net worth as goodwill to be included in its net worth and to be amortized over 12 years; and

- to permit Plaintiff, after raising the capital it was obligated to raise under the agreement, to pay dividends on preferred stock

**D. Aftermath of the enactment of FIRREA.**

Because of the enactment of FIRREA, Plaintiff failed to meet the minimum capital requirements. Def.'s Mot. at App. 7. Accordingly, Plaintiff filed an amended "Capital Restoration Plan" with OTS on February 28, 1990. Def.'s Mot. at App. 5. Plaintiff proposed that it should be acquired by another financial institution by May 31, 1990. Def.'s Mot. at App. 8. This plan was approved by OTS on condition that Plaintiff's board of directors execute an operating agreement that consented to the appointment of a receiver or conservator if a merger was not agreed to. On May 10, 1990, Plaintiff elected not to execute an operating agreement. As a consequence, on May 22, 1990, OTS denied the capital restoration plan and imposed operating restrictions on Plaintiff. Def.'s Mot. at App. 45.

In response, in May 1990, Plaintiff filed suit against OTS in the United States District Court for the Eastern District of Washington and sought a temporary restraining order. The district court issued a temporary restraining order in May 1990 and a preliminary injunction in August 1990. The preliminary injunction restricted the ability of OTS and FDIC to regulate Plaintiff and held that some of the forbearances were contracts. *Sterling Sav. Assoc. v. Ryan,* 751 F.Supp. 871, 881–83 (E.D.Wash.1990). The U.S. Court of Appeals for the Ninth Circuit, following *Far West Fed. Bank v. OTS,* 951 F.2d 1093 (9th Cir.1991), reversed, vacated the injunction, and held that "[a] thrift's remedy against the government, if any, is not an injunction against the enforcement of FIRREA but damages for breach of contract or for a taking of property." *Sterling Sav. Assoc. v. Ryan,* 959 F.2d 241 (Table), 1992 WL 73884 at *1 (9th Cir. April 14, 1992). On September 13, 1995, the district court transferred the case to the United States Court of Federal Claims. On January 19, 1996, Plaintiff filed suit in this Court.

**II. Standard for Summary Judgment**

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS,* 998 F.2d 979 (Fed.Cir. 1993). The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. After adequate time for discovery and on motion, summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, where that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must resolve any doubts about factual issues in favor of the nonmoving party, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1307 (Fed.Cir.1998), and draw all reasonable inferences in its favor. *See Gasser Chair Co. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, 773 (Fed.Cir.1995). When the case is before the Court on cross-motions for summary judgment, each motion is evaluated under the same standard. *Cubic Defense Sys., Inc. v. United States,* 45 Fed.Cl. 450, 457 (1999).

**III. Contractual Obligations of the Government**

Although Defendant marshaled numerous arguments against a finding of contractual liability in the briefings that it filed in this case, it elected at oral argument to pursue only some of those arguments. In light of numerous decisions issued in other *Winstar*-related cases before this Court, Defendant is to be commended for narrowing the outstanding issues in the liability phase of this proceeding.

Nevertheless, to a significant degree the outstanding issues in this case either overlap

or are virtually undistinguishable from the "cross-cutting" issues formulated by the Plaintiffs' Coordinating Committee. In *California Federal Bank, FSB v. United States*, then-Chief Judge Smith decided some of these cross-cutting issues that applied to many *Winstar*-related cases, in an effort to expedite decision-making. *California Federal Bank, FSB v. United States*, 39 Fed.Cl. 753 (1997) (*"Cal.Fed. I"*). His goal was that the parties would apply the decisions that he made on these issues to other *Winstar*-related cases or show how this could not be done. On appeal, this procedure received at least tacit approval by the Federal Circuit in *California Federal Bank, FSB v. United States*, 245 F.3d 1342 (Fed.Cir.2001) (*"Cal.Fed. II"*).[2] The Show Cause Order incorporated in the decision in *Cal.Fed. I* gave to the Defendant in other *Winstar*-related cases the opportunity to distinguish their cases from *Cal.Fed. I*. As reasonably read, the Order gave Defendant the opportunity to make legal and factual arguments. In order that his decision in *Cal.Fed. I* would be given appropriate significance, Chief Judge Smith emphasized that the "government in responding to this order shall not raise issues that have been resolved by opinions in the original *Winstar* cases as clarified in this decision." *Cal.Fed. I*, 39 Fed.Cl. at 779. To some extent, as discussed below, the issues raised by Defendant here are virtually indistinguishable from those raised in the original *Winstar* cases.

In this specific case, the Government filed its response to former Chief Judge Smith's Order to Show Cause on February 20, 1998. Because the Federal Circuit has tacitly approved the cross-issue approach and Defendant has had an opportunity to distinguish this case from that of *Cal.Fed. I*, the Court will treat the decisions in *Cal.Fed.* to be the law of the case. To the extent that Defendant has not distinguished the promises made in the transactions at issue in this case from those promises that were upheld as contracts in *Cal.Fed.*, the Court must find that Defendant undertook contractual obligations towards Plaintiff in these transactions.

### A. Lewis

#### 1. The Government Promised To Count Goodwill Towards Regulatory Capital.

■ Defendant argues that the Government did not promise to count the supervisory goodwill arising from the Lewis transaction towards regulatory capital because the forbearance letter did not expressly state that goodwill could be counted as an asset for purposes of regulatory capital. In light of the limiting statement in the forbearance letter which stated it "does not and shall not be construed to constitute forbearance or wavier by the Bank Board or the FSLIC with respect to any regulatory or other requirements other than those encompassed within the preceding paragraphs 1 through 3," so Defendant argues, the omission of any reference to treatment of supervisory goodwill as an asset was intentional.

While it seems clear that Defendant did not expressly promise to count goodwill from the Lewis transaction in terms of a forbearance from regulatory action, such an express promise is contained in the forbearance letter's confirmation that "[f]or purposes of reporting to the Bank Board, the value of any intangible assets resulting from accounting for the Acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 40 years by the straight line method." Pl.'s Mot. at A–7, 3. Indeed, Defendant does not point to any intangible assets other than supervisory goodwill that would arise from the accounting of the Lewis transaction. Moreover, a forbearance from adverse regulatory action from counting supervisory goodwill towards regulatory capital was unnecessary because, as Defendant concedes, "Bank Board policy during the 1980s permitted goodwill to be counted as regulatory capital...." Def.'s Reply at 11, n. 5. In construing a contract, the court must interpret it insofar as all provisions are given effect. *United Int'l Investigative Svcs. v. United States*, 109 F.3d 734 (Fed.Cir.1997); *Blake Constr. Co. v. United*

---

2. The Government had brought up the procedure as an issue on appeal. The Federal Circuit explicitly mentioned it in its opinion and did not disapprove it.

*States,* 987 F.2d 743, 746 (Fed.Cir.1993). To the extent that Defendant provides an alternative interpretation to the meaning of the intangible asset amortization clause in the forbearance letter, the Federal Circuit held that a nearly identical clause contained in the forbearance letter with respect to the Winstar transaction in *Winstar v. United States* was "an express agreement allowing Winstar to proceed with the merger plan approved by the Bank Board, including the recording of supervisory goodwill as a capital asset for regulatory capital purposes to be amortized...." *Winstar II,* 64 F.3d at 1544. While both parties have submitted extrinsic evidence as to whether the parties intended that Plaintiff would count supervisory goodwill towards regulatory capital, the Court need not resort to such evidence in this case. From the context of the transaction itself, and following *Winstar,* Defendant undertook a contractual obligation to permit Plaintiff to count goodwill arising from Lewis for purposes of regulatory capital requirements.

2. The Government's Promise To Count Goodwill Towards Regulatory Capital Did Not Last For Only Five Years.

■ Defendant argues that, even if it did undertake a contractual obligation to count goodwill arising from the Lewis transaction towards regulatory goodwill, it did so for only five years pursuant to the five-year term of forbearance from exercise of regulatory authority. However, this argument has been adequately addressed by former Chief Judge Smith in *Cal.Fed. I* and the Federal Circuit in *Cal.Fed. II.* This Court also resolved the same issue, following the two *Cal.Fed.* decisions in *Citizens Federal Bank, FSB v. United States,* 53 Fed.Cl. 793, 797 (2002).

California Federal received forbearance letters that provided for amortization of

goodwill for a period of 35 years and for a period of 40 years, respectively. Those transactions also included agreements not to enforce FHLBB net worth requirements for a period of five years. *Cal.Fed. II,* 245 F.3d at 1345. In this context, the Federal Circuit concluded:

We view the five-year expiration provision as relating only to the net worth forbearances that barred the FHLBB from enforcing its capital requirements for five years to the extent that any violation of those requirements was traceable to the subject acquisitions. The terms of the forbearance letters permitting the amortization over 35 to 40 years were separate and apart from the five-year enforcement-related terms. In any event, the five-year expiration provision of the net worth forbearances does not negate other obligations under the merger plan, including the specific time periods for amortization of goodwill.

*Id.* at 1348 (citing *Winstar II,* 64 F.3d at 1542).

As in *Cal.Fed.,* the promise to count goodwill towards regulatory capital and to amortize it over forty years was separate and apart from the five year forbearance from enforcement action. Because the use of goodwill for regulatory capital purposes was not contrary to regulations, no forbearance from enforcement action by the Bank Board or the FSLIC was necessary, thereby rendering the five year limitation on forbearances inapplicable. Accordingly, Defendant undertook a contractual obligation to permit the amortization of goodwill arising from the Lewis transaction over a forty-year period.[3]

3. The Burden Of The Risk Of Regulatory Change For The Reporting Of The FSLIC Capital Contribution Was Not Shifted To Plaintiff.

■ Defendant argues that section 3(a)(2) of the Assistance Agreement entered into by

---

**3.** Defendant attempts to distinguish this case from *Cal.Fed. I* by pointing towards a supplemental affidavit by Harold Gilkey, Chairman and CEO of Plaintiff, in which he states that Plaintiff enjoys unspecified forbearances due to the acquisition of Lewis and Tri–Cities for five years. Pl.'s Reply at App. H, ¶ 5. However, this statement

does not change the fact that the provision providing amortization of goodwill for a period of 40 years in the case of Lewis (or 15 years for Tri–Cities) is in itself a separate promise from the promise to forbear regulatory sanctions against Plaintiff.

Plaintiff and FSLIC provided that the burden of the risk of regulatory change was placed on Plaintiff. Section 3(a)(2) provided that the cash contribution could be reported to the Bank Board as a part of Plaintiff's net worth except when the accounting was required to be filed consistent with GAAP. Pl.'s Mot. at App. A–6, § 3(a)(2). However, FIRREA mandated that all reporting to OTS "incorporate generally accepted accounting principles to the same degree that such principles are used to determine compliance with regulations prescribed by the Federal banking agencies." 12 U.S.C. § 1463(b)(2)(A). Because the contract expressly provided for the possibility that GAAP reporting requirements might be imposed upon the Plaintiff, Defendant maintains that it did not breach any contractual obligation to allow the cash contribution to be counted towards Plaintiff's net worth after FIRREA was enacted.

Defendant concedes that former Chief Judge Smith addressed a similar risk of regulatory change issue in *Cal.Fed. I*, but maintains that the present case is distinguishable insofar as *Cal.Fed. I* dealt with the risk of regulatory change with respect to counting of goodwill towards regulatory capital and not capital contributions. Furthermore, Defendant notes that the clause analyzed in *Cal. Fed.* is the equivalent of section 9 of the Assistance Agreement which concerns accounting principles in general and not section 3(a)(2) specifically applicable here. *See* Pl.'s Mot. at App. A–7, § 9. However, the logic underlying *Cal.Fed. I's* holding is equally applicable to section 3(a)(2) in this case, notwithstanding the fact that the risk of regulatory change arguments in *Cal.Fed. I* included somewhat different language and involved a different section in the Assistance Agreement which concerned general accounting principles as opposed to the specific accounting treatment found in section 3(a)(2). In *Cal.Fed. I*, Chief Judge Smith identified Issue 12 as: " 'Successor regulation' language in an assistance agreement, net worth maintenance agreement, or in other agreements *per se* placed the risk of change in the law on the acquiring thrift.' " *Cal.Fed. I*, 39 Fed.Cl. at 777. His decision was: "The court is required to follow the Supreme Court and reject Defendant's argument that 'successor

regulation' language shifted the risk from the government to [Benj. Franklin Savings and Loan Association]." *Id.* at 779. Chief Judge Smith cited, as rationale for his holding, Justice Scalia's concurrence in *United States v. Winstar*. "If, as the dissent believes, the Government committed only 'to provide [certain] treatment unless and until there is subsequent action' ... then the Government in effect said 'we promise to regulate in this fashion for as long as we choose to regulate in this fashion'—which is an absolutely classic description of an illusory promise." *Id.* at 777–78 (citing *Winstar III*, 518 U.S. at 921, 116 S.Ct. 2432 (Scalia, J., concurring)) (citations omitted). While it is true that Plaintiff is required under the proviso to report to the Bank Board in accordance with GAAP, the mere fact that Plaintiff is required by the Assistance Agreement to comply with a change in statute or regulation—which it must do in any event—does not permit the limiting clause to operate as an illusory promise or otherwise allow Defendant to revoke its own obligations toward Plaintiff without liability. Accordingly, Plaintiff did not bear the risk of regulatory change with respect to the FSLIC cash contribution in the Lewis transaction.

### B. Tri–Cities

#### 1. The Government's Promise To Count Goodwill Towards Regulatory Capital Did Not Last For Only Five Years.

The forbearance letter issued by the Bank Board in the Tri–Cities acquisition specifically provided as a forbearance that the value of any intangible asset could be amortized by Plaintiff for 15 years for the purpose of reporting to the Bank Board. However, Defendant argues, as it did with respect to the Lewis transaction, the contract provided that the Bank Board would forbear for only five years following consummation of the transaction from exercising its authority due to the negative net worth of Sterling caused solely by the Tri–Cities acquisition, citing as evidence Mr. Gilkey's supplemental affidavit submitted in this case and in the prior district court action. Because Defendant's argument with respect to the Tri–Cities trans-

action is virtually identical to its argument with respect to the Lewis transaction, the Court similarly finds that Defendant undertook a contractual obligation to amortize the goodwill resulting from the acquisition of Tri–Cities over the course of 15 years.

2. The Burden Of The Risk Of Regulatory Change For Counting The FSLIC Capital Contribution Towards Regulatory Capital Was Not Shifted To Plaintiff.

As in the Lewis transaction, Defendant argues that the section 3(a)(2) of the Tri–Cities Assistance Agreement provided that the burden of the risk of regulatory change in the accounting treatment of the FSLIC capital contribution was placed on Plaintiff. Therefore, so Defendant argues, the Government did not breach any contractual obligation to count the FSLIC capital contribution towards regulatory capital when the enactment of FIRREA prohibited such GAAP-inconsistent accounting treatment. Because section 3(a)(2) in both the Lewis and the Tri–Cities Assistance Agreements are substantially the same, the Court finds, as it did with respect to Lewis, that the burden of any risk of regulatory change that might require Plaintiff to report financial statements to the Bank Board according to GAAP was not placed upon Plaintiff.

C. Central Evergreen

1. The Government Made A Promise To Permit Goodwill To Be Counted Towards Regulatory Capital And To Be Amortized Over 12 Years.

■ The Central Evergreen transaction was structured differently from the typical *Winstar*-related case. In this specific case, the basis for contractual liability is found solely in a Resolution of the Bank Board approving the merger, a reciprocal resolution of Plaintiff's board of directors, and a business plan contained in an agreement between Plaintiff and FSLIC, which was explicitly referenced in the Bank Board resolution. Unlike the *Winstar* cases, the Bank Board did not issue a forbearance letter, and no Assistance Agreement or Supervisory Action Agreement which contained an integration

clause which incorporated forbearance letters and resolutions of the Bank Board was entered into by the parties in the Central Evergreen transaction.

Nevertheless, in its response to then Chief Judge Smith's Order to Show Cause, filed February 20, 1998, (after it had filed its initial dispositive motion in this case on April 7, 1997) Defendant generally conceded that *Cal.Fed. I* precluded Defendant's arguments against a finding of liability with respect to the Central Evergreen transaction.

In [*Cal.Fed. I*], the Court clearly rejected our contentions regarding the existence of a contract with respect to Sterling's acquisition of Central Evergreen. In its opinion, the Court appears to hold, at several points, that the mere approval by a Government representative of a merger application, in the economic and regulatory context of the 1980s, created a contract. Specifically, for the first time, the Court states that the creation of a contract regarding the use of goodwill to satisfy the FHLBB's minimum capital requirement could be demonstrated, for example, by: (a) a letter to the FHLBB which stated that the purchase method of accounting would be used to record a proposed merger; (b) FHLBB approval of an application to merge; and (c) the issuance of a so-called "accounting forbearance" letter which mentioned the purchase price of accounting and the amortization of goodwill over a period of 35 years [citations omitted]. This holding was reached notwithstanding the absence of one or all of the circumstances that the Courts in previous *Winstar* opinions had held supported their holdings in those cases that contracts relating to the use of goodwill to satisfy the FHLBB's minimum capital requirement had been incorporated into an Assistance or Supervisory Action Agreement.

\* \* \* \* \* \*

In any event, if the Court did in fact intend to hold that the existence of a contract in the Central Evergreen acquisition had been demonstrated solely by the existence of the type of documents noted above, then our principal basis for contending that no

contract was formed in connection with that acquisition has been rejected. Several of our other arguments were similarly rejected. Although there are factual differences between this case and the four cases that formed the basis for [*Cal.Fed. I*], given the breadth of that opinion, we do not believe these differences to be dispositive.

Def.'s Resp. to Order to Show Cause at 20, 22.

The Federal Circuit affirmed the finding of contractual liability in *Cal.Fed. I. Cal.Fed. II*, 245 F.3d at 1346–48. Specifically, the Federal Circuit held that the absence of an assistance agreement incorporating forbearance letters did not preclude the finding of liability, but rather a court could "consider[ ] contemporaneous documents and surrounding circumstances that included forbearance letters." *Id.* at 1346. "The assistance agreements were executed between acquiring thrifts and the government only in those situations where the government included a further inducement to the acquiring thrift to complete the transaction in the form of a capital credit." *Id.* In the case of the Brentwood and Family acquisitions at issue in *Cal.Fed.*, the Federal Circuit held that documents such as Bank Board resolutions can be sufficient to demonstrate an intent to enter into contract:

> the government bargained with Cal.Fed. to assume the net liabilities of the acquired thrifts in exchange for favorable regulatory consideration allowing goodwill to be counted as an asset for regulatory capital purposes and to be amortized over 35 to 40 years. We agree with the Court of Federal Claims that "[i]f the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and [FHLBB] resolutions confirm that intent, the absence of an [assistance agreement] or [supervisory action agreement] should be irrelevant to the finding that a contract existed." *Cal.Fed. I*, 39 Fed.Cl. at 773. We therefore conclude that there were legally binding bargained-for exchanges in

the Brentwood and Family transactions....

*Id.* at 1347.

Turning to the case at bar, and following the reasoning of *Cal.Fed. II*, the reciprocal resolutions of the Bank Board and Plaintiff's board of directors, along with the business plan contained within the agreement between FSLIC and Plaintiff, are sufficient evidence of intent to enter into a bargained-for exchange between the parties. First, the Resolution of the Bank Board clearly states that it intended to enter into the transaction for supervisory purposes, i.e., to prevent the probable failure of Central Evergreen. The resolution itself provided that Plaintiff, through its certified public accountant, would report any goodwill arising from the merger as well as the amortization period for the same. The certified public account statement provided that $23,800,000 in goodwill resulted from the transaction as a result of the negative net worth of Central Evergreen. The business plan provided that the amount of goodwill reflected in the transaction would be treated as an asset in Plaintiff's proforma financial reports. The fact that the business plan itself showed that the assets (including the intangibles of $39.3 million) exceeded liabilities by only $24.1 million demonstrates that, under the agreement, Plaintiff had to be permitted to count goodwill as an asset in order to make the merger a viable one. The Bank Board resolution, furthermore, required that its terms be ratified by Plaintiff's board in order to be effective, which was accomplished. Moreover, there can be no doubt that both parties provided consideration for the contract. Plaintiff was required to take on Central Evergreen's negative net worth while the Government provided favorable regulatory treatment in permitting goodwill to be counted as an asset. Therefore, this Court holds that the Government entered into a contract to permit Plaintiff to count goodwill as an asset for regulatory capital purposes and amortize it over a 12–year period.

■ However, Defendant makes the further argument, which it reserved in its response to the Order to Show Cause, that the burden of the risk of regulatory change was

expressly shifted to Plaintiff as reflected in sections V.D and V.M of the agreement between FSLIC and Plaintiff. In *Guaranty Financial Services, Inc. v. Ryan*, 928 F.2d 994, 999–1000 (11th Cir.1991), virtually identical language to that found in § V.D of the Agreement was to deemed to have shifted the risk of future regulatory change onto the thrift. Defendant further notes that the *Guaranty* decision was cited in a footnote in the U.S. Supreme Court's *Winstar* plurality opinion. The footnote reads as follows:

> To be sure, each side could have eliminated any serious contest about the correctness of their interpretive position by using clearer language. *See, e.g., Guaranty Financial Services, Inc., v. Ryan*, 928 F.2d 994, 999–1000 (1991) (finding, based on different contract language, that the Government had expressly reserved the right to change the capital requirements without any responsibility to the acquiring thrift.).

*Winstar III*, 518 U.S. 839, 870 n. 15, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

However, as noted in *Castle v. United States*, 42 Fed.Cl. 859, 862–64 (1999), *aff'd in part and rev'd in part on other grounds*, 301 F.3d 1328 (Fed.Cir.2002), the *Guaranty* decision did not hold that the words of the successor regulation provision in of themselves mandate that the risk of regulatory change must be shifted onto the plaintiffs, but that the risk, in *Guaranty*, was shifted onto the plaintiffs because, within the context of the agreement entered into by the parties, such an interpretation "harmonize[d] the various provisions of the contract instead of placing them in conflict." *Castle*, 42 Fed.Cl. at 863 (quoting *Guaranty*, 928 F.2d at 999). Plaintiff argues here, convincingly, that the words "[a]ll regulations of the Board or the FSLIC used in this Agreement" that "may increase or decrease the Acquirer's obligation under this Agreement" means that Plaintiff could be required to comply with regulations regarding the obligations set out in section III of the Agreement, which provided that Plaintiff must: (a) maintain its capital level at or above the minimum capital requirement, (b) raise additional capital as necessary to achieve the proper ratio of regulatory capital to total assets, (c) not pay any common stock dividend without permission, and (d) report any deviations from the business plan. Pl.'s Mot. at App. C–3, § III. While Plaintiff's obligation with respect to capital requirements could be increased or decreased, the successor regulation clause does not in any way purport to alter *Defendant's obligation* to allow Plaintiff to count goodwill arising from the Central Evergreen transaction towards regulatory goodwill and to amortize it over 12 years. Indeed, Defendant's argument to the contrary faces the same problem as its successor regulation argument with respect to the Lewis and Tri–Cities transactions; namely, that the goodwill promise by Defendant would be rendered illusory.

Defendant's reading of section V.M of the agreement suffers from the same infirmity insofar as it would render the goodwill promise illusory. More to the point, the statement "[t]his Agreement is not a waiver of or a forbearance from any applicable regulation" is easily understood within the regulatory environment at the time that the contract was entered, in which the regulations permitted Plaintiff to count goodwill as regulatory capital. Nowhere is it claimed that either the Agreement between Plaintiff and FSLIC or the goodwill promise in the Central Evergreen transaction served as a waiver or a forbearance from any applicable regulations. In short, section V.M does not mean that Defendant was free to extricate itself from breach-of-contract liability simply by issuing new regulations but instead serves to preclude Plaintiff from claiming that FSLIC had granted any forbearances or waivers of its regulatory authority. Because Plaintiff's reading of the successor regulation clauses in sections V.D and V.M is more harmonious with the overall purpose of the Agreement, the Court finds that burden of the risk of regulatory change was not shifted to Plaintiff.

2. The Government Did Not Undertake A Contractual Obligation To Permit Plaintiff To Pay Preferred Stock Dividends After Raising Capital.

■ Plaintiff argues that Defendant contracted with it to permit it to pay dividends on preferred stock after raising the capital it

was obligated to raise under its Agreement with FSLIC. This argument is easily disposed of in favor of Defendant. The Agreement provided that Plaintiff agreed "not to pay any common stock dividend without the prior written approval of the Supervisory Agent." Pl.'s Mot. at App. C–3, § III. C. However, Plaintiff cannot point to any language in the Agreement that stated or implied that Defendant was obliged to permit Plaintiff to do anything with respect to any stock dividends, common or preferred. The Agreement does not even mention preferred stock at all.

#### 3. The Government Did Not Make Any Agreement Permitting Plaintiff To Maintain Capital At Levels At Variance With Regulations.

 Plaintiff argues that FSLIC agreed that it could operate in the five years following the agreement at the lesser of either: (i) a capital ratio prescribed by any future regulation or (ii) the capital projected in the business plan attached to the agreement between Plaintiff and FSLIC. However, this argument is contrary to the terms of the Agreement between FSLIC and Plaintiff. The Agreement between Plaintiff and FSLIC held that Plaintiff would not be required to raise additional capital until its regulatory capital reached the minimum statutory level, or the level set by the business plan, whichever was less. Pl.'s Mot. at App. C(3), § III. A. However, at no time did the Government ever obligate itself not to raise or lower the level of regulatory capital that Plaintiff was required to maintain. Defendant was only contractually obliged to permit Plaintiff to count goodwill towards regulatory capital.

### IV. Breach

As in the Glendale transaction in the initial *Winstar* case "[t]here can be little question that the application of the FIRREA and the regulations thereunder to deny or restrict plaintiffs' contractual rights to use supervisory goodwill with the associated amortization periods ... was a breach." *Winstar II*, 64

F.3d at 1544. When Plaintiff satisfied the conditions set forth by the contractual documents, "the government's contractual obligations became effective and required it to recognize and accept the purchase method of accounting for the mergers and the use of supervisory goodwill and capital credits as capital assets for regulatory capital requirements." *Id.* at 1545. After FIRREA was enacted and its implementing regulations were promulgated, Defendant prohibited Plaintiff from recording supervisory goodwill and FSLIC cash contributions as assets for regulatory capital purposes and from amortizing the goodwill. It also imposed restrictions upon Plaintiff's operations for failing to meet its regulatory ratio requirements as a result of prohibiting Plaintiff from recording supervisory goodwill and FSLIC cash contributions as assets.

 Accordingly, with respect to the Lewis and Tri–Cities transactions, the Court finds that Defendant breached the contractual rights of Plaintiff to the use of supervisory goodwill and FSLIC cash contributions for regulatory capital purposes and to amortize the goodwill over 40 and 15 years, respectively. Defendant also breached its contractual obligation with respect to the Lewis and Tri–Cities transactions to forbear from exercising its regulatory authority against Plaintiff for failing to meet its regulatory ratio requirements when it imposed restrictions on Plaintiff's operations. With respect to the Central Evergreen transaction, Defendant breached its obligation to permit Plaintiff to use supervisory goodwill for regulatory capital purposes and to amortize it over a period of 12 years.

### V. Conclusion

Plaintiff's motion for partial summary judgment as to liability is GRANTED and Defendant's partial motion to dismiss is GRANTED in part, DENIED in part and its motion for summary judgment is GRANTED in part and DENIED in part.[4] The parties

4. To the extent that Plaintiff's restitution claim in its complaint is an affirmative claim, as opposed to a remedy, that claim is dismissed. At oral argument, Plaintiff stated that it did not oppose

the dismissal of its due process claim and its specific performance claim. Tr. at 9. Accordingly, those claims are dismissed. Consideration of the issue of Plaintiff's lack of standing due to the

are ORDERED to file, within 10 days, a joint status report as to future proceedings in this case and to include three mutually agreeable dates for a status conference.

issuance of an injunction in the district court proceeding is deferred to the damages phase of this proceeding. Likewise, the issue of whether the FSLIC cash contribution was to be perma- nently attributed as an asset is deferred to the damages phase of this proceeding. Consider- ation of any taking claims is deferred until the resolution of all contract claims.